GOVERNMENT EMPLOYEES
INSURANCE COMPANY

v.

BENTON, Ernest, Appellant in
No. 88–1175.

BENTON, Ernest, Appellant in
No. 88–1176,

v.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY.

Nos. 88–1175, 88–1176.

United States Court of Appeals,
Third Circuit.

Argued Aug. 16, 1988.

Decided Oct. 12, 1988.

Rehearing and Rehearing In Banc
Denied Nov. 7, 1988.

R. Steven Shisler (argued), Bernard L. Kubert & Associates, P.C., Philadelphia, Pa., for appellant.

William H. Resch, Jr. (argued), David M. McCormick, Liebert, Short, Fitzpatrick & Hirshland, Philadelphia, Pa., for appellee.

Before STAPLETON and MANSMANN, Circuit Judges, and FISHER, District Judge.*

**OPINION OF THE COURT**

MANSMANN, Circuit Judge.

At issue is whether the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.Cons.Stat.Ann. § 1701 *et seq.*, (Purdon 1984) (effective October 1, 1984), which mandates underinsured motorist coverage, affects policies of insurance applied for *prior* to the effective date yet not actually received by the insured until sometime thereafter. We must interpret the meaning of the statute's usage of the words "delivery", "issued", and "issued for delivery" in the context of delineating the scope of coverage of an automobile insurance policy.

Relying upon procedures outlined under the Pennsylvania Automobile Insurance Plan and principles of statutory construc-

---

* Honorable Clarkson S. Fisher of the United States District Court for the District of New Jersey, sitting by designation.

tion, we conclude that the insurer issued its policy for delivery prior to the effective date of the Financial Responsibility Law. The policy's terms are therefore controlled by the new law's predecessors, the now-repealed No–Fault Vehicle Insurance Act, Pa. Stat.Ann. tit. 40, § 1009.101 *et seq.* (Purdon 1974), and the unrepealed Uninsured Motorist Act, Pa.Stat.Ann. tit. 40, § 2000 (Purdon 1963) which do not provide for underinsurance coverage. The district court order granting summary judgment in favor of the insurance company, denying underinsured motorist insurance coverage to the insured, will be affirmed.

## I.

On September 28, 1984, Jean Brisco, in conjunction with the purchase of a motor vehicle, applied to the Pennsylvania Automobile Insurance Plan for automobile insurance through a broker. The Automobile Insurance Plan, also known as the assigned risk plan, was created pursuant to § 1009.108 of the No–Fault Act to assure that individuals who were unable to obtain insurance through conventional means would be provided the necessary coverage and benefits afforded by that statute.[1]

The application for insurance which Brisco completed included the following language:

Coverage under this evidence of automobile insurance is effective from the effective date and time stated thereon. This evidence of automobile insurance will terminate immediately upon the issuance of the policy applied for. . . .

At the bottom of the application, above the insurance broker's and Brisco's signatures, was the stated effective date of the applica-

tion—September 28, 1984, at 9:00 a.m. On this date, the No–Fault Act was still in operation.

Sometime in the next two weeks Brisco received a policy and an insurance card from the insurer designated under the Automobile Insurance Plan to provide her with coverage, Government Employees Insurance Company ("GEICO"). Brisco later discarded both the policy and the ID card. It is undisputed that the written terms of the policy did not contain underinsured motorist coverage.

On November 8, 1984, Brisco's father, Ernest Benton, while a pedestrian, was struck by an automobile.[2] The operator of the vehicle which struck Benton was insured by Erie Insurance Company. To compensate for the injuries sustained in the accident, Benton received a $15,000.00 settlement in release for his claim against both the driver and Erie Insurance Company.

Finding this settlement amount inadequate, Benton filed a motion in a Pennsylvania state court to compel appointment of an arbitrator and to compel arbitration to determine his rights, specifically, his entitlement to underinsured motorist coverage under the insurance policy issued by GEICO. The case was removed to the federal district court where GEICO petitioned for a declaratory judgment that it had no obligation to provide underinsurance motorist coverage to Benton. In its petition GEICO claimed that underinsured motorist coverage was not required by the No–Fault Act and was not provided for in the policy issued to Brisco. The issues were joined and to a certain extent discovery proceeded.[3]

---

1. Under § 1751 of the Financial Responsibility Law, insurers providing financial responsibility must organize and maintain an assigned claims plan in a fashion similar to that which existed under the No–Fault Act.

2. At the time of the accident, Benton was residing with his daughter. There is no dispute that he was entitled to coverage under his daughter's insurance plan.

3. This case represents an example of procedural conformity gone awry. Discovery requests

were ignored, filing deadlines went unheeded, and motions were not decided. Of paramount concern was Benton's failure to respond timely to GEICO's request for admissions under Fed.R. Civ.P. 36. This lackadaisical compliance created confusion because it is unclear whether the district court's entry of summary judgment in favor of GEICO resulted from GEICO's Rule 36 requests being deemed as admitted under Rule 36(a), or whether Benton's eventual response to the requests, in addition to his response to GEICO's motion for summary judgment and his

On February 19, 1988, the district court entered orders granting summary judgment in favor of GEICO and dismissing Benton's petition to compel appointment of an arbitrator and to compel arbitration. The district court, holding that Pennsylvania law governed the case, summarily decided that the Financial Responsibility Law was not applicable to the policy issued by GEICO to Brisco. Benton has appealed and we now have jurisdiction pursuant to 28 U.S.C. § 1291.

Since the basic facts are uncontested, we exercise plenary review over the legal conclusions supporting the district court's grant of summary judgment in favor of GEICO. *Adams v. Gould, Inc.*, 739 F.2d 858 (3d Cir.1984). The specific legal question involved is one of statutory construction, *i.e.*, what are the meanings of the words "delivered", "issued", and "issued for delivery" as utilized in the Financial Responsibility Law? Questions of statutory construction also invoke our power of plenary review. *Chrysler Credit Corporation v. First National Bank and Trust Company of Washington*, 746 F.2d 200 (3d Cir.1984).

## II.

On September 28, 1984, when Brisco applied to the Automobile Insurance Plan, the Pennsylvania Motor Vehicle No–Fault Insurance Act was in effect. At that time, under the Uninsured Motorist Act, all insurance policies issued in Pennsylvania were required to include uninsured motorist coverage. Pa.Stat.Ann. tit. 40, § 2000(a). Underinsured motorist coverage, however, was not mandated. *Votedian v. General Accident Fire and Life Assurance Corp.*, 330 Pa.Super. 13, 478 A.2d 1324 (1984). Benton concedes that if the No–Fault Act is applicable to the present policy, then no underinsurance motorist coverage is due to him.

On October 1, 1984, the Financial Responsibility Law became the law in Pennsylvania. Underinsured motorist coverage was now required. 75 Pa.Cons.Stat.Ann. § 1731(a). The Supplemental Provisions of the Financial Responsibility Law provide that the law applies to insurance policies issued or renewed after the October 1, 1984 effective date. Section 11 of the Supplemental Provisions of the Act of February 12, 1984, P.L. 53, No. 12, 1984 Pennsylvania Legislative Service 129; 75 Pa.Cons. Stat.Ann. § 1701, note. *Accord Brack v. Allstate Ins. Co.*, 666 F.Supp. 703 (M.D.Pa. 1986).

The primary basis of Benton's appeal is that underinsured motorist coverage occurs here by operation of law. To justify entitlement to this coverage, Benton relies on § 1731(a) of the Financial Responsibility Law. This section states that after October 1, 1984, "no motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth without underinsured motorist coverage." According to Benton, because Brisco did not receive physical possession of the policy from GEICO until after the effective date of the Financial Responsibility Law, the GEICO policy must provide the now-required underinsured motorist coverage.

Discerning which of the Pennsylvania statutes dictates the coverage afforded by the policy here may involve a two-step analysis. First, we must determine when coverage under the GEICO policy became effective. If coverage became effective *after* October 1, then clearly the Financial Responsibility Law would govern. If, however, the policy was in effect *prior* to October 1, 1984 and governed by the No–Fault Act, we must decide whether the actual receipt of the policy after October 1 transforms the policy into one subject to the provisions of the Financial Responsibility Law.

Since Brisco's application for insurance was initiated through the assigned risk

---

own cross motion for summary judgment, were considered by the court in entering judgment.

We will assume that since the language of the district court order indicates that Benton's response was considered, and also because GEI-CO's request for admissions could be interpreted as asking for conclusions of law, impermissible under Rule 36, (*see* Fed.R.Civ.P. 36 advisory committee's note), we will proceed to the substantive points of the matter before us.

plan, we begin by examination of the Pennsylvania Automobile Insurance Plan and the role it plays in determining the effective date of coverage of the insurance policy.

## III.

Section 12 of the Pennsylvania Automobile Insurance Plan outlines the procedures through which insurance companies participating in the assigned risk plan provide coverage to those applying for automobile insurance through the Plan.

Generally, upon receipt of the application for insurance and a deposit for a premium payment, the Plan makes a determination whether the applicant qualifies for coverage. If the eligibility requirement is satisfied:

> [T]he Plan shall upon receipt of the application for insurance ... designate a company to which the applicant shall be assigned and so shall advise the applicant and the producer of the record and *shall state in such notice when the coverage shall be effective, which date shall be 12:01 a.m. on the date following the date of mailing of the application to the Plan....*

(Emphasis added.)

The record supports the conclusion that GEICO's obligation to provide coverage to Brisco commenced in accordance with the above-stated provision. GEICO's confirmation of coverage sheet [4] which outlined the extent of the company's coverage at the time of Benton's accident included the phrase "PA INCEPT DATE: 9/29/84." September 29, 1984, is 12:01 a.m. of the date after Brisco made application to the Plan and, presumably, the day following the date of mailing of the application to the Plan. Although neither party has enlightened us as to the meaning of "INCEPT DATE," in accordance with the language of the Plan, a reasonable interpretation is that INCEPT DATE indicates when coverage commenced under Pennsylvania's assigned risk plan.

GEICO proposes that its coverage became effective on September 28, the date of application. It argues that the application itself encompassed the extent of its obligation for coverage until replaced by the more specific, though substantively identical, evidence of coverage—the actual policy.

The Plan does allow in some instances that, if the applicant so requires and if the broker follows certain prescribed steps, coverage may become effective upon application.[5] We are unable to conclude from the record whether the broker followed the Plan's necessary criteria to effectuate application date coverage, but, in any event, such a determination is not required. Whether GEICO's obligation to provide coverage commenced on application on September 28 or the date following, September 29, is of no consequence here since both dates precede the effective date of the Financial Responsibility Law. Therefore, at least until October 1, 1984 coverage was in place and was governed by the then-opera-

---

**4.** In both the table of contents of the Appendix and during the course of oral argument the confirmation of coverage sheet was referred to as the "declarations."

**5.** Under Section 12 of the Plan if an applicant requires that coverage become effective at the time of application, the producer of the record (here, the insurance broker) must indicate the time and date when so required. Coverage will become effective upon application if:

    1. the producer of record and the applicant certify, on a form prescribed by the Plan, the date (day, month and year) and time (hour, A.M. or P.M.) that the application was written, and

    2. the producer forwards to the Plan Office, no later than the day after the application is written two copies of such form as prescribed by the Plan and simultaneously will supply the applicant with a copy of said affidavit duly executed by the producer, and

    3. the producer of record maintains appropriate records of all risks for which he has designated the time and date of coverage and agrees that he will permit inspection or photocopying of such office records by the Plan or by a company representative. The inspection or photocopying will be limited to an applicant whose effective date and time of coverage is in question due to the occurrence of an accident or claim arising under the policy issued under this Section.

tive No–Fault Act.[6]

## IV.

We turn now to whether enactment of the Financial Responsibility Law, predating the actual physical delivery of the policy, imbued the GEICO policy with underinsurance coverage by operation of law. The determinative inquiry is whether the activity on either September 28 or September 29 represented GEICO's "issuance" [7] of a policy to Brisco.

Under the Pennsylvania Statutory Construction Act, 1 Pa.Cons.Stat.Ann. § 1921(b) (Purdon 1972), where the words of a statute are unambiguous, the letter of the law shall not be disregarded under the pretext of pursuing its spirit. *Chesler v. Government Employees Insurance Co.*, 302 Pa.Super. 356, 448 A.2d 1080 (1982), *rev'd on other grounds*, 503 Pa. 292, 469 A.2d 560 (1983).

As both parties point out, the crucial terms "delivery", "issued", or "issued for delivery" are not defined in the Financial Responsibility Law. Where the statute under scrutiny does not supply the definition of common usage words, we must assume the words' commonsense meaning. *Derry Township, Dauphin County v. Swartz*, 21 Pa.Commw. 587, 346 A.2d 853 (1975).

Applying this plain-meaning mandate we conclude that "delivery" of the policy is unambiguous and *refers to that moment when Brisco received the policy from GEICO through the mail.* Our examination does not end here because it is clear that the parties did not intend that the physical delivery of the policy have any operative effect on the coverage.

The meaning of "issued for delivery" is less clear. Accordingly, we once again consult the Statutory Construction Act's guidelines of interpretation.

Under § 1921(c) of the Act, when the words of a statute are not explicit, the intention of the legislature may be ascertained through the following:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.Cons.Stat.Ann. § 1921(c).

We acknowledge that the import of the stated effective date is normally not the type of information gleaned through discussion of legislative intent. We reference the statute's history here briefly, in accordance with § 1921(c)(1) through (5) and § 1921(c)(7),[8] only to determine if there

---

**6.** The dissent construes Brisco's application to the Automobile Insurance Plan as creating a "binder," but does not indicate which entity became obligated under the "binder." We believe that the "binder" nomenclature more properly describes a situation where a specific insurance company, as contrasted to a company-to-be-designated, becomes contractually obligated to an insurance applicant for a short period of time until coverage commences for a longer period under the terms set forth in a policy.

We have concluded that coverage initiated on 12:01 a.m. of the day after application and that the application and the policy were not separate and distinct outlines of coverage but merely represented different evidence of that coverage.

**7.** The exact statutory language to be construed is "issued for delivery" as used in § 1731(a) and "issued" as used in the Supplemental Provisions.

The dissent notes that under the § 1933 of the Statutory Construction Act the specific language of the Supplemental Provisions that the Financial Responsibility Law applies to policies issued or renewed after October 1, 1984 controls the general recitation of § 1731(a) that "no ... insurance shall be delivered or issued for delivery...."

We perceive neither conflict between the provisions require a finding that one controls the other nor substantive difference between the phrases. Therefore, when appropriate, we will utilize either term or its derivative interchangeably.

**8.** Section 1921(c)(8)'s directive to examine legislative interpretation of the statute is not helpful since no such annotation exists.

One non-legislative viewpoint of the effective date is that if a policy was in force before

were any considerations in the law's enactment which indicate if the chosen effective date of October 1, 1984 held any particular relevance.

The No–Fault Act was a complex statute which created a large body of appellate case law interpreting its terms. *See Heffner v. Allstate Insurance Company*, 265 Pa.Super 181, 401 A.2d 1160 (1979), *aff'd*, 491 Pa. 447, 421 A.2d 629 (1980). Judicial interpretation of the Act often favored coverage which led eventually to increased insurance costs for consumers. According to Senator Edward Holl, this was the principal problem that precipitated the movement to repeal the No–Fault Act. *See* Comments of Senator Edward Holl in Legislative Journal—Senate (October 4, 1983).

Although the goal of remedying the high cost insurance crisis does not precisely impact upon the significance of the effective date of the statute, we do perceive the intent of the legislature in this regard as aspiring to a speedy death to the No–Fault Act. We do not, however, read into the desire to rid the books of an unpopular law an implication of a retroactive effect of the Financial Responsibility Law. Any concept of retroactivity is diminished by the statutory recital of the presumption against such an effect, *see* 1 Pa.C.S.A. § 1926, and by reference to Pa.Const. art. I, § 17 which forbids the enactment of any law impairing the obligation of contracts. An insurance policy is to be interpreted by the same rules governing any other contract.

*McCaffrey v. Knights of Columbia*, 213 Pa. 609, 63 A. 189 (1906).

Accordingly, Benton's claim that upon physical receipt of the actual policy the coverage provided by the application ceased and a new policy with expanded coverage was "issued" constitutes an abrogation of general contract law and an unconstitutional impairment of such rights.[9] Brisco contracted for certain coverage provided by Pennsylvania law when she made application to the Automobile Insurance Plan. At that time the applicable law was the No–Fault Act. To argue that she received the expanded coverage set forth in the Financial Responsibility Law upon receipt of the policy would grant her something for which she did not contract nor within her contemplation at the time of contracting.[10]

The § 1921(c) guidelines also counsel us to consider the consequences of a particular interpretation of statutory language. This practical orientation provides a more concrete basis for our analysis of the effective date of the statute. We first note that the meaning of "issued" has been subjected to prior scrutiny and in reference to an insurance policy, has been found to be used in different senses. *See generally* 44 C.J. S. Insurance § 262 *et seq.* On some occasions, "issued" may mean the preparation and signing of the instrument, as distinguished from its delivery to the insured. The term may also be construed to define the policy's delivery and acceptance where-

October 1, 1984, the Uninsured Motorist Act as opposed to the Financial Responsibility Law would apply even if the accident occurred after the statutory change. Ronca, J., Sloane, L., and Mundy, J., *Pennsylvania Motor Vehicle Responsibility Law*, § 6.15 (1986). This is consistent with our conclusion that a policy effective prior to the new law is governed by the old law.

**9.** As noted in our discussion of the facts of this case, the application document itself provides that the application *as evidence* of automobile insurance terminates upon issuance of the policy. Benton construes this provision as support for his argument that new coverage was initiated upon receipt of the actual policy.

We dispute this characterization on two grounds. First, the application speaks in terms of its and the actual policy's value *as evidence* that insurance does in fact exist. This language

clearly states that the application will serve as evidence of insurance coverage until the actual policy can fulfill this role. Receipt of the policy does not then terminate the specific coverage enjoyed by the insured prior to physical possession of the policy; the policy merely replaced the application as physical evidence of insurance coverage.

We note here that, in accord, the Financial Responsibility Law allows a copy of the application for insurance to constitute acceptable proof of coverage indicating financial responsibility. 67 Pa.Code § 219.6(b)(3).

The second reason we reject the theory that receipt of the policy superceded the specific coverage provided by the application results from our finding that the policy was in force prior to October 1.

**10.** See n. 11, below.

by it becomes a binding mutual obligation. Agreement of the parties may determine the date of issuance of the policy.[11]

In addition, although the date of the policy does not necessarily determine the date of issue, when the words "date of issue of a policy" had been used to designate the date on which the policy becomes effective, this means the date which the policy itself bears rather than the date of actual execution or delivery. *Id.* § 263. In *Mutual Insurance Company v. Hurni Packing Company*, 263 U.S. 167, 44 S.Ct. 90, 68 L.Ed. 235 (1923), the Supreme Court construed the "date of issue" of a life insurance policy as referring not to the actual execution of the policy or the time of its delivery but rather to the date of issue as specified by the policy itself. In *Potts v. Metropolitan Life Insurance Co.*, 133 Pa. Super. 397, 2 A.2d 870 (1938), the Pennsylvania Superior Court utilized the authority of *Hurni* and held that the date of issue of a policy is defined by the policy itself.

The policy issued to Brisco[12] does not expressly set forth the effective date of the policy but does state that the policy applies only to accident and losses which occur during the policy period as shown in the declarations. While the record does not contain a document labeled "Declarations,"[13] it includes the coverage confirmation sheet listing "DATE OF INCEPT" as September 29, 1984. This being the most reliable record evidence of the policy's effective date, and since under the teachings of *Hurni* and *Potts* the policy encompasses the definitive statement of the date of issue, we conclude that September 29 is the date the policy was issued by GEICO.

Any other interpretation would result in unintended consequences. The actual receipt of the policy here only constituted a formalization of the terms agreed to in the application for insurance. Otherwise, the effectiveness of the policy's issuance would rest upon the uncertain event of receipt of the document through the mail.

## V.

We would agree that if the policy were "issued" after October 1, 1984 without mention of underinsured motorist coverage, coverage would be present by operation of law. *See Johnson by Johnson v. Travelers*, 348 Pa.Super. 278, 502 A.2d 206 (1985). Coverage occurring by operation of law is, however, confined to those situations where coverage becomes mandated by statute at the time of contracting, and not, as in this case, where the new law became effective after the effective date of the insurance contract.

The Pennsylvania legislature chose to enact a bright line statute making the new law effective only to those policies issued or renewed after October 1, 1984. The record supports a finding that the Brisco policy was issued prior to October 1, 1984 and was governed, at least until its renewal date, by the previous laws. We will, therefore, affirm the order of the district court denying application of the Financial Responsibility Law.

STAPLETON, Circuit Judge, dissenting.

In 1984, the Pennsylvania Legislature determined that it was desirable for all motorists to have underinsured motorist coverage. It therefore decreed that "[n]o motor vehicle liability insurance shall be delivered or issued for delivery in [the] Commonwealth, ... unless ... underinsured motorist [coverage is] provided therein...." 75 Pa.Cons.Stat.Ann. § 1701(a) (1984). The legislature established October 1, 1984 as the effective date of this decree

---

11. In Benton's response to interrogatories presented by GEICO, the question requesting the date of issue of policy was answered as "September 28, 1984." Although we have already decided that the date of issue is a legal question which could not be admitted by the parties, *see*, n. 3, *id.*, we do note this admission as some evidence of the intent of the parties at the time of application.

12. We note that Brisco discarded the actual policy and insurance card. The record does, however, contain a copy of a policy certified by affidavit to be identical to the one sent to Brisco.

13. See n. 4, above.

and stipulated that the new requirement "applies to insurance policies issued or renewed on or after the effective date...." Section 11 of the Supplemental Provisions of the Act of February 12, 1984, P.L. 53, No. 12, 1984 Pennsylvania Legislative Service 129 (Purdon) (codified at 75 Pa.Cons. Stat.Ann. § 1701 note). Since Ms. Brisco's policy was her first with GEICO and not a renewal, the issue for decision is whether or not her policy was "issued ... on or after" October 1, 1984.[1] The court equates issuance with the inception of coverage and concludes that it was not. I disagree.

When the Pennsylvania legislature specified that the new requirement would apply to "insurance policies issued ... on or after the effective date," it had in mind something tangible that could be "delivered or issued for delivery"; it equated the issuance of a policy with the creation of a *policy document.* This reading is not only supported by the text of the statute but also by considerations relating to the legislative objective of the statute and by industry usage and practice.

The Pennsylvania Legislature set October 1, 1984 as the effective date of its legislation in order to provide advance notice of the new requirement. Such notice having been given, the legislature undoubtedly wished as many motorists as possible to have underinsured motorist coverage as soon as possible. It recognized, however, that the scope of insurance is normally evidenced by a written policy and that additional coverage could not be included in written policies that had left the hands of the insurer. I think it fair to assume that the legislature reconciled these competing considerations by requiring the additional coverage in all policy documents that had not already left the hands of the insurer on the effective date. Accordingly, I think it very doubtful that the legislature intended to give an insurer the option on or after October 1st of either including the new coverage in the policy document or leaving

it out and specifying an earlier date for the inception of coverage.

Moreover, this reading of the phrase "issuance of a policy" or "policy issuance" is consistent with industry usage and practice as reflected in Pennsylvania's Automobile Insurance Plan (the Plan), under which Ms. Brisco's policy was issued. As we shall hereafter see, the Plan uses these phrases to denote the creation of a policy document and makes it clear that policy issuance is quite ,distinct from the commencement of coverage.

With this understanding of the meaning of policy issuance, I turn to the issue of whether the policy document in this case was created before October 1, 1984. The application form that Ms. Brisco signed provided in part as follows:

This application having been completed and duly executed shall be from the effective date and time shown below, evidence of insurance in the limits and coverages specified, subject to the following conditions:

1. Coverage *under this evidence of automobile insurance* is effective from the effective date and time stated herein. This evidence of automobile insurance will terminate immediately upon (a) the *issuance of the policy applied for,....*
2. A premium charge will be made for *these* coverages if the policy, when and as issued, is not acceptable by the insured.
3. The insurance afforded hereunder shall be subject to all the terms and conditions of the policy form prescribed for use in accordance with the rules of the Automobile Insurance Plan.

Effective Date and time

| 9 | 28 | 84 | 9:00 | AM |
|-------|-----|------|-------|-----|
| Month | Day | Year | Hours | PM |

My signature hereon represents certification of the Statement of the Producer of Record on the face of this application AND I certify this application is sub-

---

1. The pertinent statutory language is not "delivered or issued for delivery." While that language is helpful in deciding what the legislature meant by "issued," another section of the Act specifically describes the policies to which the

Act applies, and it governs the issue before us. *See* 1 Pa.Cons.Stat.Ann. § 1933 (1972) (Pennsylvania Statutory Construction Act) (specific provision prevails over general one).

mitted pursuant to the effective date provisions contained in the Automobile Insurance Plan of this state.

../s/.............. Date 9/28/84 Hour 9:00 A.M.

PRODUCER'S SIGNATURE

App. at 179 (emphasis added).

These provisions indicate to me that Ms. Brisco received a binder pursuant to Section 12 of the Pennsylvania Automobile Insurance Plan [2] which provided her with coverage from the date of the application until the "issuance of the policy applied for." It is undisputed that GEICO did not execute the policy document evidencing the "policy applied for" until after October 1st. While it is true that there was coverage before that date, I cannot believe the drafters of the Motor Vehicle Financial Responsibility Law intended that the existence of coverage under a binder would excuse an insurer from including the new coverage where the policy itself remained in the insurer's hands as of October 1, 1984. Accordingly, I conclude that Ms. Brisco's policy was "issued on or after" October 1, 1984.

Even if Ms. Brisco's coverage did not take effect immediately, however, the result should be the same. As the court notes, in the absence of special arrangements for immediately effective coverage, the Plan mandates that coverage become effective "at 12:01 A.M. on the day following the date of mailing of the application"

**2.** The relevant provisions of Section 12 are as follows:

Should the applicant require that the coverage applied for become effective at the time of application, the producer of record shall indicate the time and date when coverage is required. The coverages and limits for which the applicant is applying shall become effective as of the time the application is completed provided:

1. the producer of record and the applicant certify, on a form prescribed by the Plan, the date (day, month and year) and time (hour, A.M. or P.M.) that the application was written, and
2. the producer forwards to the Plan Office, no later than the day after the application is written two copies of such form as prescribed by the Plan and simultaneously will supply the applicant with a copy of said affidavit duly executed by the producer, and
3. the producer of record maintains appropriate records of all risks for which he has

unless the postmark is not legible, in which event coverage commences "at 12:01 A.M. on the day following receipt [of the application] by the Plan Office." Section 12, Supp. Appendix 10. This effective date must be stated in the notice of designation forwarded by the Plan to the applicant and the designated company. The Plan then goes on to mandate the *issuance of a policy* or a written binder at a later time. Thus, Section 14 provides in part:

A. **Original Policy**—Upon receipt of the notice of designation and the premium or deposit from the Plan, *the designated company shall:*

\*    \*    \*    \*    \*    \*

(2) *within fifteen days issue a policy* if all information necessary for the company to fix the proper rate is contained in the application form, *such policy to become effective 12:01 A.M. on the date specified by the Plan* in the notice of designation, or

(3) within fifteen days issue a binder if all information necessary for the company to fix the proper rate is not contained in the application form, such binder to become effective 12:01 A.M. on the date specified by the Plan in the notice of designation, ...

Supp.App. at 7 (emphasis added).

I would hold that the policy in this case was "issued" no earlier than the date upon which GEICO satisfied its responsibility

designated the time and date of coverage and agrees that he will permit inspection or photocopying of such office records by the Plan or by a company representative. This inspection or photocopying will be limited to an applicant whose effective date and time of coverage is in question due to the occurrence of an accident or claim arising under the policy issued under this Section. In no event shall coverage be effective prior to the time shown on the application. The Plan shall forward to the designated carrier the original copy of the application form, the notice of the effective date of the coverage (certification form) and the deposit, same to be credited by the company against the policy premium, if for any reason the applicant refuses to accept the policy, the designated company shall retain the short rate earned premium for the period of coverage or the sum of $10.00 per car, whichever is greater, and return the balance to the applicant.

under these provisions of Section 14 and, accordingly, that the underinsured motorist coverage required by law should be read into Ms. Brisco's policy.