866 F.2d 1004
 CONSOLIDATION COAL COMPANY and State of North Dakota, Petitioners,
v.
Mary McGRATH (Widow of Frederick McGrath)
and
Director, Office of Workers' Compensation Programs, United
States Department of Labor, Respondents.
 No. 88-1241.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 21, 1988.
Decided Jan. 26, 1989.
 
 David Allen Barnette, Charleston, W.Va., for petitioners.
 Robert Kirschman, Washington, D.C., for respondents.
 Before ARNOLD and MAGILL, Circuit Judges, and ROSS, Senior Circuit Judge.
 MAGILL, Circuit Judge.
 
 
 1
 This case arises under the Black Lung Benefits Act, Title IV of the Federal Coal Mine Health and Safety Act of 1969, Pub.L. No. 91-173, 83 Stat. 742 (codified as amended at 30 U.S.C. Secs. 901-45 (1982)). Consolidation Coal Company (employer) appeals decisions of the Administrative Law Judge and the Benefits Review Board awarding benefits under the Act to Mary McGrath (claimant), widow of Frederick McGrath (miner). After a close review of the record, we reverse.
 
 I. BACKGROUND
 
 2
 Frederick L. McGrath worked for Consolidation Coal Company as an electrician and welder/mechanic from October 19, 1944 until December 31, 1972, when he retired. McGrath spent most of his time working in a repair garage near the open pit lignite mines; when heavy equipment broke down in the mines, he went into the pits to repair it. At trial, McGrath's supervisor testified that the miner was a good employee and that he was able to perform all of the duties of his job until his retirement.
 
 
 3
 Approximately one year after retiring, McGrath became ill. Hospital records indicate that he suffered from an inflammatory cell pathology of the lungs. In 1975, McGrath was treated for shortness of breath, wheezing, easy fatigability and loss of weight. Beginning in 1974, doctors performed several chest x-rays, a pulmonary function study, a lung biopsy and several arterial blood gas studies. Suggested diagnosis for his condition included lymphatoid granulomatosis and Hodgkin's disease. McGrath died on June 29, 1976. The death certificate lists the cause of death as renal failure resulting from a urinary tract infection or septicemia, and also notes the presence of granulomatous pulmonary infiltrate.
 
 
 4
 On March 30, 1978, Mary McGrath filed this claim for benefits under the Black Lung Benefits Act, based on her husband's employment in surface lignite mining. The matter came before an Administrative Law Judge for formal hearing in February 1983. The ALJ issued a Decision and Order awarding benefits to the claimant, reasoning that, despite a lack of evidence demonstrating that the miner suffered from pneumoconiosis, the company failed to establish that the miner was not partially or totally disabled due to pneumoconiosis at the time of his death. The Benefits Review Board affirmed the findings of the ALJ in January 1988, and this appeal followed.
 
 II. DISCUSSION
 
 5
 A. Title IV Protection and Open Pit Lignite Mines
 
 
 6
 As a threshold issue, we must determine whether the Black Lung Benefits Act covers miners who work in open pit lignite mines. The employer contends that the claimant is not eligible for benefits because Congress did not intend to include surface miners of lignite under the Black Lung Benefits Act. In determining whether the Black Lung Benefits Act covers miners employed in open pit lignite mines, we must examine the plain language of relevant statutory provisions. Sierra Club v. Clark, 755 F.2d 608, 613 (8th Cir.1985). If the plain language is clear and unambiguous, it controls. United States v. Archambault, 767 F.2d 402, 403 (8th Cir.1985). Based on our reading of the plain language of the statute, we find that the Black Lung Benefits Act covers surface miners of lignite.
 
 
 7
 Section 3 of the Federal Coal Mine Health and Safety Act of 1969 defines "miner" as "any individual working in a coal mine" and defined "coal mine" as "an area of land * * * used in * * * the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method * * *." 30 U.S.C. Secs. 802(g)-(h) (emphasis added). Section 802 specifically states that the definitions contained therein are applicable "[f]or the purposes of this chapter," without limiting their applicability to the Black Lung Benefits Act, subchapter IV of the chapter. Section 4 of the original Act is similarly unambiguous, stating that "[e]ach coal mine * * * shall be subject to the provisions of this Act." Pub.L. No. 91-173, Sec. 4, 83 Stat. 742, 744 (1969) (emphasis added). This language clearly indicates that all coal mines as defined under the Act are subject to all provisions of the Act, including Title IV.
 
 
 8
 The 1977 amendments to the 1969 Act explicitly addressed the applicability of the section 3(h) definition of "coal mine" to Title IV. Thus, section 102(b)(3) of the amendments added the introductory phrase "[f]or purposes of titles II, III, and IV " to the statutory definition at section 3(h). Pub.L. No. 95-164, Sec. 102(b)(3), 91 Stat. 1290 (emphasis added).[1] According to this language, we must apply the section 3(h) definition of "coal mine" from the 1969 Act to miner compensation cases arising under the Black Lung Benefits Act. Thus, we hold that the Black Lung Benefits Act covers miners who work in open pit lignite mines.
 
 B. Standard of Review
 
 9
 The company argues that, because surface miners have a lower incidence of pneumoconiosis than underground miners, the ALJ and, by implication, this court should view claims arising solely from surface mining of lignite with stricter scrutiny than claims arising from mining of bituminous coal or anthracite. This contention, for which the company provides no authority, clearly contradicts the relevant statutory provisions, which do not distinguish surface mining from other forms of mining. Therefore, we reject the company's argument and apply the customary standard of review.
 
 
 10
 The Benefit Review Board's scope of review of an ALJ's decision is limited: the Board may set aside the ALJ's factual findings only if they are not supported by substantial evidence in the record as a whole. 33 U.S.C. Sec. 921(b)(5); Director v. Rowe, 710 F.2d 251, 254 (6th Cir.1983), quoted in Newman v. Director, OWCP, 745 F.2d 1162, 1164 (8th Cir.1984). This court's role is to ensure that the Board properly adhered to this standard. Thus, we must examine the ALJ's factual determinations and the record as a whole. Hon v. Director, OWCP, 699 F.2d 441, 444 (8th Cir.1983). In so doing, we look not only to evidence supporting the ALJ's findings, but to any evidence in the record which detracts from such findings.
 
 C. Examination of the ALJ's Decision
 
 11
 The Black Lung Benefits Review Act effectively establishes a rebuttable presumption of pneumoconiosis for miners working a certain number of years in coal mine employment. 30 U.S.C. Sec. 921(c). Because McGrath died before March 1, 1978 and was employed for twenty-five years in coal mines before June 30, 1971, his widow is entitled to benefits under the Act "unless it is established that at the time of his * * * death such miner was not partially or totally disabled due to pneumoconiosis." 30 U.S.C. Sec. 921(c)(5).
 
 
 12
 We find no support for the ALJ's conclusion that the employer failed to rebut the presumption of pneumoconiosis. The record presents no substantial evidence that the miner had pneumoconiosis, but presents a great deal of evidence that the miner did not suffer from the disease. All of the physicians who submitted reports[2] either specifically found no objective evidence of coal workers' pneumoconiosis or indicated that the miner's problems were not related to his coal mine employment.
 
 In his decision and order, the ALJ stated:
 
 13
 To be sure, the X-ray evidence is negative for pneumoconiosis, and the death certificate makes no mention of pneumoconiosis. Moreover, the deceased miner worked steadily and regularly up until the time of his retirement. Yet none of these factors considered alone would be sufficient to demonstrate the absence of a partial disability * * *.
 
 
 14
 In reviewing the "other evidence" in the record, the ALJ discussed only two pieces of medical evidence: the statement of a doctor from the Mayo Clinic that a pleural tap and lung biopsy performed on the miner suggested a diagnosis of lymphomatoid granulomatosis and the testimony of an expert witness, Dr. Kress, at the hearing.
 
 
 15
 On our review of the record, we find that the ALJ ignored other significant medical evidence and mischaracterized Dr. Kress' testimony. The ALJ was correct in stating "the absence of evidence establishing the existence of pneumoconiosis does not necessarily establish that Mr. McGrath did not suffer from the disease." This case, however, presents extensive medical evidence that the miner did not suffer from pneumoconiosis. The miner's treating physician, Dr. Carriedo, indicated no finding of coal workers' pneumoconiosis and "did not know" whether the miner's condition was caused by dust exposure. Dr. Carriedo ordered the lung biopsy which led to Dr. Leung's diagnosis of the miner's condition as lymphomatoid granulomatosis. Before the hearing, Dr. Lewis H. Weiland of the Mayo Clinic reviewed the biopsy slides. His diagnosis showed pseudolymphoma with an alternative diagnosis of malignant lymphoma or lymphomatoid granulomatosis. Dr. L. Hohholzer, the Chief of Pulmonary Mediastinal Pathology of the Armed Forces Institute of Pathology, also reviewed the biopsy materials. He suggested the possibility of Hodgkin's disease while noting sarcoid-like granulomas in the cellular infiltrate. The fact that none of these physicians mentioned coal workers' pneumoconiosis in their findings was clearly evidence the ALJ should have considered in determining whether the presumption was rebutted.
 
 
 16
 Whether or not the miner suffered from coal miners' pneumoconiosis is a question that calls for medical expertise. As a panel of this court has stated, "[w]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who testified before him." Newman, 745 F.2d at 1164, quoting Gober v. Matthews, 574 F.2d 772, 777 (3d Cir.1978). In his report and testimony, Dr. Kress clearly stated that any disability suffered by the miner was unrelated to his coal mine employment.[3] The ALJ's findings are contrary to Dr. Kress' medical testimony and unsupported by any other medical evidence.
 
 III. CONCLUSION
 
 17
 This case presents no medical evidence showing that the miner suffered from pneumoconiosis and significant evidence that he did not suffer from the disease. We find the evidence on the record sufficient to rebut any presumption of coal workers' pneumoconiosis, and therefore reverse the administrative decisions.
 
 
 
 [1]
 Congress amended the 1969 Health and Safety Act to extend the coverage of its safety provisions to all mines as part of the renamed 1977 Safety and Health Act. In doing so, Congress provided a new definition of "coal or other mine" applicable to the safety provisions of subchapter I of the 1977 Act. 30 U.S.C. Sec. 802(h)(1). However, it retained the earlier definition of "coal mine" (formerly 30 U.S.C. Sec. 802(h), now 30 U.S.C. Sec. 802(h)(2)) expressly for the purposes of subchapter IV, the Black Lung Benefits Act
 
 
 [2]
 We reach this conclusion without relying on the report of Dr. Kleinerman, which was submitted to the ALJ after the hearing. The ALJ acted within his discretion in refusing to consider the report
 
 
 [3]
 A review of the record shows that the ALJ misconstrued Dr. Kress' testimony. Dr. Kress did not see the biopsy evidence until midway through his testimony. As a result of his last minute review of the biopsy findings, Dr. Kress testified on redirect as follows:
 QUESTION: (Mr. Barnett)
 Doctor, would you, then, change your opinion, at all, based on this biopsy report as to the presence or absence of coal workers' pneumoconiosis?
 ANSWER: (Dr. Kress)
 I think, from a medical standpoint, there was no evidence of coal workers' pneumoconiosis.
 QUESTION: Since this is a biopsy, can you say that with a greater degree of certainty than you would if you merely had X rays and other type of evidence?
 ANSWER: Oh, I think, without question, that's correct.
 QUESTION: With reasonable degree of medical certainty, you would make that statement?
 ANSWER: Yes.
 Under examination by claimant's counsel, Dr. Kress made the following statement.
 QUESTION: (Mr. Scheunemann)
 Now, again, considering the history, the pulmonary function study, the biopsy, do you feel that you can positively rule out any contribution to this lung condition by coal workers' pneumoconiosis?
 ANSWER: (Dr. Kress)
 I think so. I think the evidence is pretty good--
 QUESTION: (Interrupting) You can rule it out at the present time?
 ANSWER: Yes, I believe so.
 (App-157)