**Ernest F. HANNA, Petitioner,**

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Respondent.**

No. 88–3071.

United States Court of Appeals, Third Circuit.

Argued July 26, 1988.

Decided Oct. 25, 1988.

---

Richard Zorn (argued), Barbara Johnson, U.S. Dept. of Labor, Office of the Sol., Washington, D.C., for respondent.

Gerald B. Graham (argued), Ravenna, Ohio, for petitioner.

Before HIGGINBOTHAM, BECKER and COWEN, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

On this appeal, we are asked to determine whether a person who worked for a coal mine operator that was also the consumer of the coal produced, and who assisted in the loading of coal at the mine site onto coal barges, was a miner within the meaning of the Black Lung Benefits Act of 1977, 30 U.S.C. § 901 *et. seq.* (1982) ("the Black Lung Act" or "the Act"). We are persuaded by the plain language of that statute that someone who "loads" coal is a miner and, therefore, we will set aside the order of the Benefits Review Board that affirmed the decision of the Administrative Law Judge ("ALJ") that the Appellant was not entitled to benefits under the Act. Accordingly, we will remand this case to the ALJ for entry of an order in accordance with this opinion.

## I.

Appellant, Ernest Hanna, worked as a deck hand, fireman and engineer on stern-wheelers and on diesel tugs that pushed coal barges along the Monongahela River. The tugs pushed coal that had been extracted from mines at one end of that river to be delivered to steel mills of the Jones and Laughlin Steel Company ("J & L") in Pittsburgh, which used the coal to produce coke and steel. J & L consumed all of the coal that was produced from these mines. It owned each of the mine sites as well as the coal mining preparation and boating operations.

Hanna was employed by J & L in the capacities listed above between 1926 and 1930 and again between 1936 and 1969. For most of that time, Hanna worked seven days per week and was aboard the coal tugs twenty-four hours a day (except for eighteen hours per week off-duty shore leave).

Hanna worked with a tug crew that transported empty coal barges to four or more coal mines that were situated forty to fifty miles up the Monongahela. The tugs visited the mine sites daily. They were anchored immediately adjacent to the tipple and preparation facility of each site while the crew assisted in the loading of the coal barges,[1] or if the barges had been pre-load-

---

**1.** The record reflects that Hanna's responsibilities included participation in the loading of the coal onto the barges. Counsel for the Director conceded, during oral argument of this appeal, that Hanna's participation was necessary to the loading of the coal:

COURT: Does the record support [Hanna's] contention that he had to be there managing the barge while the coal was being ... unloaded from the tipple into the barge?

ZORN: The record establishes that he helped line up the barges so that they could be loaded.

    . . . .

COURT: Why wasn't [Hanna] involved with the loading? If he's there to steady the barges, to superintend the barges, during the loading, then why isn't he involved in the loading?

ZORN: His primary function in steadying that barge is to take that coal to the steel mills ...

COURT: Well I think it's a little more than that. I think that his primary purpose is to make sure that when the coal comes down from the tipple it goes into the barge and not into the river. Unless you have something to collect

ed, while the crew created a "tow" of six or more loaded barges and annexed it to the tug. The duration that the tugs remained at a site varied between two and six hours.[2]

## II.

In 1978, Hanna discovered that he had contracted pneumoconiosis[3] and filed a claim for benefits under the Black Lung Act. Pursuant to the provisions of that statute, Hanna made an application for benefits to the Department of Labor, which rejected his claim on the grounds that he was not a miner within the meaning of the statute. Hanna petitioned for and was granted a formal hearing before the ALJ on his claim for benefits and that hearing was held two years later in October, 1980. The petition named J & L, as the owner operator of the mine, and the Director of the Office of Workers' Compensation Programs ("the Director") as respondents. The ALJ subsequently issued a decision concluding that "[Hanna]'s employment at the loading sites constituted coal mine transportation in and around a coal mine to the extent that he was exposed to coal dust as a result of such employment." *In Re Hanna*, Case No. 80–BLA–5467, Decision and Order at 4 (Feb. 11, 1981), *reprinted in* Appellant's Appendix ("App.") at 23. Thus, to the extent that Hanna's illness resulted from the time that he was required to be present at the loading site, the ALJ held that he was a miner within the Act and, therefore, entitled to benefits. The ALJ remanded the matter to the Deputy Commissioner of the United States Department of Labor, Division of Coal Mine Workers' Compensation ("the Deputy Commissioner") for additional factual findings

regarding the claim, specifically: the length of Hanna's coal mine employment, whether Hanna had pneumoconiosis that was causally related to his coal mine employment, whether Hanna was totally disabled and whether that disability was the result of his pneumoconiosis and whether Hanna had dependents and therefore entitled to augmented benefits. *In Re Hanna*, Case No. 80–BLA–5467, Order of Remand at 2 (Feb. 26, 1981), *reprinted in* App. at 27.

In accordance with the order of remand, the Deputy Commissioner developed the evidentiary record of the case and referred it again to the Office of Administrative Law Judges in June, 1982. A second formal hearing was held two years later in October, 1984. In April, 1985, the ALJ issued a decision awarding Hanna benefits. *In Re Hanna*, Case No. 82–BLA–5925, Decision and Order (Apr. 8, 1985), *reprinted in* App. at 29. In that decision, the ALJ adopted the findings of the earlier ALJ decision and, upon his review of the additional evidence, concluded that Hanna had thirty-six years of qualifying employment as a miner and that he was totally disabled as the result of pneumoconiosis that he contracted during his employment on the coal barges. The ALJ held, therefore, that Hanna was entitled to benefits beginning with the month of onset and ordered the Director to pay to Hanna "all benefits to which he is entitled under the Act augmented by reason of his one dependent described above, commencing August 1, 1978." *Id.* at 8, *reprinted in* App. at 36.

The Director filed a motion for reconsid-

the coal, the coal goes into the river, and therefore, he has to be there so that it can get on the barge. Is there something sort of illogical about that analysis?
ZORN: No, that's correct your honor.
*Hanna v. Director, OWCP*, No. 88–3071, Proceedings on Appeal (July 26, 1988).

2. Hanna's claim that his exposure to coal dust was sufficient to cause his pneumoconiosis is not contested. During the times that Hanna was on the tug at a site, he was stationed at the processing tipple of the mine. The ALJ who initially reviewed Hanna's claim found that,

during the coal loading, Hanna was exposed to dust that "was so thick that one could not see to any extent. As a result, a two or three inch layer of coal dust accumulated on the barge walkways, making it necessary for the crew to sweep this dust away for safety reasons." In re Hanna, No. 80–BLA–5467, Decision and Order at 2 (Feb. 11, 1981).

3. Pneumoconiosis, or "black lung disease," is an illness that is causally related to the significant exposure of coal dust and, for that reason, is often contracted by coal miners.

eration of that decision.[4] He argued that the earlier ALJ decision holding that Hanna was a miner was erroneous because the functions that Hanna performed on the coal tugs did not fall within the purview of the Act. He asserted that those functions contributed only to the delivery of the coal to the ultimate consumer and not to the production of coal from the mine and, therefore, that Hanna was not a miner as contemplated by the Act. The ALJ agreed and vacated the decision of the ALJ that had been entered on February 11, 1981 and his own decision that had been entered on April 8, 1985. *See In Re Hanna,* 82–BLA–5925, Decision On Motion For Reconsideration And Order Setting Aside Decision And Order (July 3, 1985), *reprinted in* App. at 45.

Hanna appealed the ALJ's decision on reconsideration to the Benefits Review Board and the Board affirmed. *Hanna v. Director, OWCP,* BRB No. 85–1759 BLA, Decision and Order (Dec. 18, 1987). Hanna now appeals from the decision of the Benefits Review Board.[5] We conclude that the Board's construction of the Black Lung Act, adopted from the decision of the ALJ, was erroneous and, accordingly, we will set aside the Board's order in its entirety and remand to the ALJ for entry of an order consistent with this opinion.[6]

### III.

"The definition of miner contains two elements—a 'situs' test requiring work in [or around] a coal mine [or a coal preparation facility], and the second, a 'function' component requiring performance of coal extraction or preparation work. Both of these requirements must be met." *Wisor*

v. *Director, OWCP,* 748 F.2d 176, 178 (3d Cir.1984) (citing *Southard v. Director, OWCP,* 732 F.2d 66 (6th Cir.1984)). *See also Stroh v. Director, OWCP,* 810 F.2d 61, 63 (3d Cir.1987); *Amigo Smokeless Coal Co. v. Director, OWCP,* 642 F.2d 68, 70 (4th Cir.1981). That definition is taken from the language of the Act, which provides that

> the term "miner" means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. Such term also includes an individual who works or has worked in coal mine construction or transportation in or around a coal mine, to the extent such individual was exposed to coal dust as a result of such employment.

30 U.S.C. § 902(d)(1982). In the present case, the Director concedes that Hanna spent a significant part of his work days at coal mine sites as contemplated by the Act and that he was exposed to coal dust as the result of that employment. The Director contends, however, that the job that Hanna performed does not meet the "function" element of the "situs and function" test. It argues that a claimant must demonstrate that both aspects of the test are met before he can demonstrate eligibility for benefits under the Black Lung Act.

We agree that both elements of that test must be proven before a claimant can be determined eligible for benefits under the Act. *Wisor,* 748 F.2d at 178. The question that remains in this case, however, is the proper manner to construe the language of the Act in the evaluation of the tasks that Hanna performed.

---

**4.** In an order that preceded the ALJ's Decision and Order of April 8, J & L was dismissed as a party upon the determination that it was not a "responsible operator" liable for benefits pursuant to the Act. *See In Re Hanna,* Case No. 82–BLA–5925. Decision and Order at 4 (April 8, 1985), *reprinted in* App. at 32.

**5.** Jurisdiction to review the decision of the Benefits Review Board is conferred upon this Court by § 921(c) of the Longshore and Harbor Workers' Compensation Act, as incorporated by § 932(a) of the Black Lung Act, which provides

that "[a]ny person adversely affected or aggrieved by a final order of the Board may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred." 33 U.S.C. § 921(c) (1982); *see also,* 30 U.S.C. § 932(a) (1982).

**6.** Our decision is predicated upon our review of the Board's interpretation of the Act. The standard for that review is plenary. *See Carozza v. United States Steel Corp.,* 727 F.2d 74, 77 (3d Cir.1984).

Hanna argues that a reading of the defining provisions of the Act in tandem, demonstrates that the Act encompasses the type of work that he did. He notes first that § 902(d) defines "miner" as an individual who works in the "preparation of coal ... [in] transportation in or around a coal mine." 30 U.S.C. § 902(d)(1982). Secondly, he notes that the "preparation" of coal, as defined by § 802(i) of the Act, means "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing and *loading* of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the *operator of a coal mine*." 30 U.S.C. § 802(i)(1982) (emphasis added). Hanna asserts that because he was involved in the loading of the coal from the processing tipple onto the barges, he falls within the Act's provisions and is entitled to benefits.

The Director contends that Hanna's work contributed only to the transportation of coal within the stream of commerce. He refers to guidelines that he has previously issued that define the transportation of coal as limited to "transportation from extraction site to preparation plant or tipple, and any transportation of coal up to the time when extraction and preparation of the coal has been completed or the time when the extracted coal enters into the stream of commerce." Coal Mine (Black Lung Benefits Act) Procedure Manual, Ch. 2–600 (8th ed. 1981); *see* Appellee's Brief at 12. The Director's guidelines note further that "persons engaged in transportation of coal [within the stream of commerce] or in functions integral to that activity, would not be covered, even if part of their time is spent in or around the mine site." *Id.* The Director cites our decision in *Stroh* as supportive of his contention that a worker who transports coal to its ultimate consumer "is not a miner since that worker deals exclusively with 'a finished product in the stream of commerce.'" Appellee's Brief at 17 (quoting *Stroh*, 810 F.2d at 64). Although we defer to the Director's general construction of the statute as expressed by his guidelines, we cannot agree that, under the facts of this case, the work that Hanna performed loading the coal at the mine site, constituted activity in the stream of commerce.

At first blush, this case appears more difficult to resolve because of the fact that Hanna's employer was both the owner and operator of the mines and the ultimate consumer of the coal that was produced. However, the appropriate characterization of Hanna's work for the purpose of entitlement under the Act is determined by evaluation of what he did, and not by who employed him. Moreover, while it is certainly true that Hanna's work served to provide coal to the ultimate consumer, who was his employer, the same was no less true of the laborers who worked solely at the mines loading coal from the tipple onto the barges—who would unquestionably be deemed covered by the Act—and who were also employees of J & L.

No doubt, difficult bright lines must be drawn in determining eligibility for benefits under the Act, and it is true that the Act does not encompass every person whose employment has required him or her to have significant exposure to coal dust. *See e.g., Southard v. Director, OWCP,* 732 F.2d 66, 69 (6th Cir.1984) (" '[w]hile there is no question that plaintiff worked in an atmosphere which was filled with coal dust, the work he performed was not the preparation of coal as contemplated by the applicable law and regulations' ") (quoting *Johnson v. Weinberger,* 389 F.Supp. 1296, 1298 (S.D.W.Va.1974)). The Director urges us to draw that bright line at the processing tipple because at that point, he argues, the processing of the coal is complete. He asserts that, because Hanna's work involved only loading the coal *from* the tipple, Hanna was participating only in the placement of the finished product into the stream of commerce. In support of that argument he cites *Collins v. Director, OWCP,* 795 F.2d 368 (4th Cir.1986), which noted that

[t]raditionally the tipple marks the demarcation point between the mining and the marketing of coal. It is at that structure that the screening of the coal occurs and the final product is loaded for transport. When coal leaves the tipple, ex-

traction and preparation are complete and it is entering into the stream of commerce.

795 F.2d at 372, *see also,* Appellee's Brief at 19.

Contrary to the Director's contention, we are not convinced that it is appropriate to draw that bright line at the point when the coal is placed into the processing tipple because we are not convinced that each step essential to the preparation of the coal for entry into the stream of commerce is completed at that point. In our view, removal of the coal from the tipple is a "necessary" part of the preparation of coal for transport into the stream of commerce. Thus, Hanna's participation in the removal of the coal from the tipple was a step, if only the very last step, in the preparation of the coal.

The Court of Appeals for the Fourth Circuit itself, in a case that preceded *Collins*—but that was not called into doubt by that decision—held that shoveling coal from the tipple into a lorry fell within the statutory definition of "work of preparing coal" under § 802(i) even though the loaded coal was destined for coke ovens and coke manufacturing did not fall within the statutory definition of preparing coal preparation. *See Sexton v. Mathews,* 538 F.2d 88, 89 (4th Cir.1976).

Our decision in *Stroh* is not inconsistent with our holding today. In *Stroh* we held that a self-employed hauler of coal *was* a miner within the meaning of the Act because he transported coal from the mine site to a processing plant that further processed the coal before retail sale. We noted that Stroh, who did not work for the mine company, would not be a miner if he merely worked to deliver completely processed coal to the ultimate consumer because his function in that instance would serve only to facilitate the introduction of the "finished product" into the stream of commerce.

In the present case, Hanna worked for the mining company, that also happened to be the coal's consumer, and his work of loading coal from the tipple onto the barges was a necessary part of the "work of preparing the coal" for delivery. That work brought him within the Act's definition of miner. *Cf. Mitchell v. Director, OWCP,* 855 F.2d 485, 490 (7th Cir.1988) (railroad employee who worked under the direction of mine workers, to wash railroad cars prior to the loading of those cars for the delivery of coal performed a task that was "necessarily ... performed prior to the loading of coal ... [and therefore] was indispensable to [the mine company's] preparation of coal for delivery," and the ALJ erred in not finding that he was a miner under the Act); *Sexton,* 538 F.2d at 89 (employee who shoveled coal from tipple into lorry performed a task that "falls within the statutory definition of the work of preparing coal" under 30 U.S.C. § 802(i) and, therefore, employee was a miner within the meaning of the Act).

Section 802(i) of the Act provides that the "loading" of coal is an act within the meaning of the term "preparation." Hanna's employment responsibilities included the "loading" of the coal, at the mine site, from the tipple onto the barges. We conclude that that work constituted participation in coal preparation and that, in this case, it was not until the coal was loaded onto the barges, and ready to flow down the Monongahela on its way to J & L, that it—both literally and figuratively—entered into the stream of commerce.[7] Accordingly, we hold that Hanna was a miner within the meaning of the Black Lung Act and that he is entitled to the benefits that the Act provides.

### IV.

For the foregoing reasons, we will set aside the order of the Benefits Review Board in its entirety, and remand this mat-

---

**7.** In our view, the loading operation of the coal in this case was not complete until the last piece of processed coal fell from the tipple onto the barge. Accordingly, this case may be put into proper perspective by reference to a famous quote attributed to a notable late twentieth century American literary figure, Lawrence R. Berra: "it isn't over til it's over."