**PENNSYLVANIA ELECTRIC COMPANY, Petitioner,**

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION, Respondent.**

**No. 90–3636.**

United States Court of Appeals, Third Circuit.

Argued May 6, 1991.

Resubmitted on Petition for Panel Rehearing June 10, 1992.

Decided July 15, 1992.

Timothy N. Atherton, Pennsylvania Elec. Co., Johnstown, Pa., John C. Proctor, Scott W. Clearwater, Joanne M. Scanlon, Winston & Strawn, Washington, DC, for petitioner.

Dennis D. Clark, Carl C. Charneski, U.S. Dept. of Labor, Office of the Sol., Arlington, Va., Robert P. Davis, Sol. of Labor, Allen H. Feldman, Associate Sol. for Special Appellate and Supreme Court Litigation, Steven J. Mandel, Deputy Associate Sol., Mark S. Flynn, Atty. U.S. Dept. of Labor, Washington, D.C., for respondent.

Donald B. Ayer, Stephen C. Yohay, Jones, Day, Reavis & Pogue, Washington, D.C., for amicus curiae Edison Elec. Institute.

Before: MANSMANN, NYGAARD and RONEY,* Circuit Judges.

## OPINION OF THE COURT

RONEY, Circuit Judge

This case questions which Government agency has jurisdiction over the safety practices in connection with handling and processing coal within an electric generating plant in Homer City, Pennsylvania. We affirmed a decision by the Federal

---

* Honorable Paul H. Roney of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

Mine Safety and Health Review Commission upholding the issuance of certain safety violation citations issued under the Mine Safety and Health Act against Pennsylvania Electric Company (Penelec). Penelec asserted that the Occupational Safety and Health Act (OSHA) should govern its practices and that the Mine Act inspector was without jurisdiction to issue the citations. Penelec filed a petition for rehearing which we granted in order that we might consider the arguments made therein.

■ Upon reconsideration, we again affirm the Federal Mine Safety and Health Review Commission, but on narrower grounds than set forth in our prior opinion. We affirm first, because the Penelec conveyor head drives constitute the "work of preparing coal" and thus they fall under the Mine Act, 30 U.S.C. § 802(h)(1), and second, because the Mine Safety and Health Administration promulgated regulations that preempt the Occupational Safety and Health Act, 29 U.S.C. §§ 651 to 678.

In order to understand how the operations at Penelec bring these two Acts into convergence, one must track the coal from the mine to the generator boilers. (*See* the parties' stipulated Exhibit B entitled "Homer City Station Coal Flow Diagram" appended hereto.)

The "raw coal" used in the Penelec generating facility to produce power is delivered by conveyor belt from two adjacent mines. The conveyor belts move the coal from the adjacent mines to scales where it is weighed and sampled. The conveyor transports the coal to the coal processing station. At the station the coal is broken, crushed, sized, washed, cleaned, dried, and blended in order to make a "useable coal product" for the electric generating facility. At the time the citations were issued, the Iselin Preparation Company, a subsidiary of one of the two mining companies, operated the station. As the stipulated diagram denotes, MSHA had previously inspected and otherwise exercised jurisdiction over the Penelec processing station since 1977. However, it has never regulated the facilities used to move the processed coal leaving the station and destined for the generating facilities.

The present dispute concerns the head drives of the conveyor belts used to transport coal from the minehead scales to the processing station located at the entrance of Bin # 1 on the parties' diagram. On January 7, 1988, an inspector from MSHA issued citations to Penelec for failing to place adequate guards around these head drives, as required under MSHA. 30 C.F.R. § 77.400(c). Penelec does not contest that it failed to guard the cited head drives or that MSHA satisfied its burden of proof with regard to the existence of the violations underlying the citations. It argues, however, that the MSHA inspector did not have the authority to issue the violations.

The Mine Act generally involves coal mining operations. *See* 30 U.S.C. § 801, *et seq.* Section 802(h)(1) provides that "structures, facilities, equipment, machines, tools or other property ... used in, or to be used in, or resulting from, ... the work of preparing coal" fall within the definition of "coal or other mine" and as such, are subject to the Mine Act's jurisdiction under section 803. Section 802(i) defines the "work of preparing coal" as the "breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine." Applying these provisions to the facts of this case, it is clear that the conveyor head drives 5A and 5B are structures used in the work of preparing coal and therefore come within the jurisdiction of the Mine Act.

■ Under the functional analysis we are to employ when giving the "broadest possible" scope to mine Act coverage, *see generally, Marshall v. Stoudt's Ferry Preparation Co.,* 602 F.2d 589, 592 (3d Cir.1979), *cert. denied,* 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980), the delivery of coal from a mine to a processing station via a conveyor constitutes coal preparation "usually done by the operator of a coal mine." 30 U.S.C. § 802(i). Thus the

**1504**

plain language of section 802(h)(1) controls this case.

Our decision in *Hanna v. Director, OWCP*, 860 F.2d 88, 92–93 (3d Cir.1988), confirms that the head drives come under the Mine Act. Like the employee who loaded coal onto the barge in *Hanna*, the head drives serve a necessary function in the "work of preparing coal" by delivering raw coal to the Iselin station where it then undergoes further processing before it is ultimately transferred to the ultimate consumer, Penelec's energy producing facility. This conclusion is also consistent with our decision in *Stroh v. Director, OWCP*, 810 F.2d 61 (3d Cir.1987), which held that the delivery of raw coal to a coal processing facility is an activity within the Mine Act, but not the delivery of completely processed coal to the ultimate consumer. *Id.* at 64.

Thus it is clear that Penelec's head drives come under Mine Act jurisdiction, regardless of whether the facility receiving the coal for processing is also under Mine Act jurisdiction. We need only look to MSHA's regulation of the conveyors leading to the coal cleaning facilities to reach the proper decision in this case.

 OSHA generally involves safety in the generating plant. 29 U.S.C. § 651, *et seq.* OSHA regulations that would otherwise apply to the head drives, however, are preempted by MSHA regulations under § 4(b)(1) of OSHA. 29 U.S.C. § 653(b)(1). The OSHA preemption analysis in this case simply requires an application of our decision in *Columbia Gas v. Marshall*, 636 F.2d 913 (3d Cir.1980). *Columbia Gas* established a two-step inquiry into whether: (1) a regulation was promulgated by a state or federal agency other than OSHA; and (2) whether the regulation promulgated covers the specific "working conditions" at issue. *Id.* at 915–16. We defined "working conditions" as the "environmental area in which an employee customarily goes about his daily tasks." *Id.* at 916. Once we are satisfied that a regulation was promulgated that covers the challenged working conditions, OSHA is preempted and the inquiry ends. We stated that the

reviewing court need not look further than the face of the regulation: "[w]e therefore need not examine the substance of preemptory regulation; as long as it covers the identical working conditions, OSHA's jurisdiction is preempted." *Id.* at 918. Consequently, we need not examine the *enforcement history* of a particular regulation. OSHA § 4(b)(1) is satisfied by the very fact that a regulation with the requisite specificity is promulgated.

Applying *Columbia Gas* to the facts of this case, it becomes clear that MSHA regulations preempt OSHA. The Mine Safety and Health Administration promulgated a safety regulation concerning conveyor head drives in 1971, and reauthorized this regulation through the period when the MSHA citations were issued to Penelec:

§ 77.400 Mechanical equipment guards.

. . . . .

(c) Guards at conveyor-drive, conveyor-head, and conveyor-tail pulleys shall extend a distance sufficient to prevent a person from reaching behind the guard and becoming caught between the belt and the pulley.

30 C.F.R. § 77.400(c). Section 77.400(c) prescribes a standard for the "environmental area," that might pose a potential danger to Penelec workers. Under our jurisprudence, that is enough to answer the question of whether OSHA is preempted.

It may be argued that we should extend our *Columbia Gas* analysis beyond the two-step analysis and inquire into the "totality of circumstances" surrounding the enforcement history of a regulation. If, for example, competing agencies such as MSHA and OSHA are allowed to regulate a working condition, the regulated party will not have adequate notice of what conduct constitutes a regulatory violation. While it may be unfair for a regulated party to be subject to the "whipsaw effects" of competing agency regulation, neither *Columbia Gas* nor the language of OSHA § 4(b)(1) can be read to authorize such an inquiry into the enforcement history of a regulation.

In *Columbia Gas* we merely looked to whether the state agency promulgated a regulation covering the specific working conditions over which OSHA attempted to issue a citation. 636 F.2d at 916–17. The critical point was the *specificity* of the regulations, vis-a-vis the working conditions, rather than whether the regulations were consistently enforced. *See U.S. Air, Inc. v. OSHRC,* 689 F.2d 1191, 1192 (4th Cir.1982) (the "crux" of § 4(b)(1) preemption is the phrase "working conditions").

■ Last, the plain language of § 4(b)(1) indicates that the enforcement history surrounding a regulation is not relevant to the issue of whether another agency preempts OSHA. Section 4(b)(1) provides, in pertinent part:

> Nothing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies ... *exercise statutory authority to prescribe or enforce* standards or regulations affecting occupational safety or health.

29 U.S.C. § 653(b)(1) (emphasis added). The operative language italicized above shows that the exercise of statutory authority by an agency triggers the preemption of OSHA. The statute does not require us to look beyond the exercise of statutory authority by the agency; no language refers to the *quality* or *consistency* of the agency's exercise of statutory authority. It is not necessary to look beyond the plain terms of § 4(b)(1) to decide the dispute. As our *Columbia Gas* decision indicates, the preemption inquiry is satisfied once we determine that an agency has exercised its authority to prescribe a safety standard or regulation and that regulation covers the specific working conditions at issue.

Here, MSHA properly issued the two citations because, at the time they were issued, MSHA had regulations concerning the safety of conveyor head drives in force and those regulations addressed the precise working conditions at issue, *i.e.,* the need for guards on conveyor head drives. Therefore, the two-step inquiry of *Columbia Gas* is satisfied and OSHA is preempted. The Secretary has satisfied her burden of showing that MSHA, rather than OSHA, is the proper agency regulating this part of Penelec's facility.

After full consideration of the arguments of the parties upon rehearing, we uphold the citations and will affirm the Commission's decision.

**1506**

HOMER CITY STATION
COAL FLOW DIAGRAM

EXHIBIT B

9/19/88
B. L. DORE

MSHA INSPECTION ACTIVITY
SINCE 1977

ADDITIONAL AREAS OF INSPECTION
ACTIVITY PURSUANT TO D. HUNTLEY'S
LETTER OF APRIL 12, 1988

10 FMSHRC 1790

MANSMANN, Circuit Judge, dissenting.

Without specifically recognizing that it does so, the majority institutes a major change in the reach of regulatory jurisdiction under the Mine Safety and Health Act and in settled interpretation of that Act. Because I do not believe that these departures are compelled or counseled by the facts of this case and because the course charted by the majority has potentially serious consequences for virtually all commercial coal consumers and their employees, I respectfully dissent.

I.

In order to place my differences with the majority in context, it is necessary to revis-

it the facts of this case. As the majority notes, this matter has its origins in events transpiring at the Homer City Generating Station located in Indiana County, Pennsylvania. The station, which is jointly owned by Pennsylvania Electric Co. (Penelec) and New York State Electric & Gas Corporation, is operated by Penelec to produce electric energy through coal combustion. The station began operation in 1969 with two power-generating units. In 1977, a third unit was added. At that time, more stringent sulfur dioxide emission requirements were imposed upon the station owners by the United States Environmental Protection Agency. To bring the new third unit into compliance with these standards, a coal cleaning facility designed to reduce the level of sulfur dioxide in certain incoming coal was constructed on the station premises.[1]

Coal burned in each of the generating units originates from three sources: the Helen Mining Company, the Helvetia Mining Company—both of which are adjacent to the Homer City station—and through a truck dump facility which acquires coal from mines throughout western and central Pennsylvania. Raw coal from the Helen and Helvetia Mines is moved from the ground to raw coal silos. From there, the coal is transported through preparation equipment designed to clean and break the coal and is then placed into clean coal silos. Coal from these mines, which is purchased by Penelec, is then delivered, via conveyor belt, to scales where it is weighed and sampled. Title passes to Penelec at this point. Conveyors 3 and 4 then carry coal to Bin 1 where further sampling takes place. Conveyors 5A and 5B (and their head drives) next move the coal from Bin 1 to Bin 2. From Bin 2, coal, depending upon its sulfur content, may be sent directly to station boilers for consumption or may be diverted into the coal cleaning plant.

Coal delivered to the Homer City truck dump has also undergone processing prior to delivery. At the truck dump facility the coal is weighed and sampled and title passes to Penelec. Some of this coal crosses conveyors 5A and 5B in order to be burned directly or, depending upon its sulfur content, may be routed instead to the cleaning plant.

Prior to 1977, the entire Homer City operation fell within the jurisdiction, for safety purposes, of the Occupational Safety and Health Administration (OSHA). This exclusive OSHA regulation ended with construction of the cleaning plant. At that time, Penelec, OSHA, and the Mine Enforcement and Safety Administration ("MESA," the predecessor to MSHA) entered into an agreement whereby MESA was authorized to assume jurisdiction over the coal cleaning plant. Under the terms of this agreement, MESA, and later MSHA, did not inspect station equipment outside of the cleaning facility; these areas remained within OSHA jurisdiction. This jurisdictional arrangement apparently operated smoothly until January, 1988 when an MSHA field inspector issued citations to Penelec after noting that the head drives [2] on conveyors 5A and 5B, which carry coal directly to station boilers *or* to the cleaning plant, lacked guards in violation of 30 C.F.R. § 77.400(c) (1990). On June 30, 1988, the Secretary of Labor filed a Petition for Assessment of Civil Penalties against Penelec.

The issuance of this January 1988, citation represented MSHA's first attempt to assert jurisdiction over any portion of the Homer City operation outside the confines of the cleaning plant.[3] MSHA's assertion of jurisdiction was based upon its conclusion that the head drives of Conveyors 5A and 5B are used in "the work of preparing

---

**1.** While Penelec and NYSEG own the cleaning plant, it was operated, at all times relevant to this litigation, by a subcontractor, Iselin Preparation Company, a subsidiary of Rochester Pittsburgh Coal Company.

**2.** A "head drive" transmits mechanical power to the head pulley of a belt conveyor.

**3.** In April of 1988, MSHA wrote to Penelec asserting jurisdiction over all portions of the Pene-

lec operation "downstream" from the coal cleaning plant. These included buildings, conveyors and related equipment involved in the handling of coal after delivery to the Station and prior to its arrival at the generating units. Conditions inside the generating units and portions of the operation "upstream" from the cleaning plant remain subject to OSHA.

the coal" as defined in 30 U.S.C. § 802(i) (1986). Because they are used in the work of preparing the coal, MSHA argued, the conveyor head drives fall within the definition of "coal or other mine" as set forth in 30 U.S.C. § 802(h)(1) (1986). As the Mining Act provides that "[e]ach coal or other mine ... shall be subject to [MSHA jurisdiction]," 30 U.S.C. § 803, it would arguably follow that MSHA was within its authority in issuing citations relating to the 5A and 5B conveyor head drives. Contesting these citations, Penelec argued before the Department of Labor administrative law judge that the conveyor head drives did *not* fall within the definition of a "coal mine" under section 802(h)(1) of the Mine Act.[4]

Following argument, the administrative law judge granted MSHA's motion for summary judgment, ruling that MSHA had jurisdiction to issue citations relating to the 5A and 5B conveyor head drives as they were used in the "work of preparing the coal" within the meaning of 30 U.S.C. § 802(i).

Penelec filed a Petition for Discretionary Review which was granted. On October 10, 1989, the Federal Mine Safety and Health Review Commission issued an opinion remanding the matter to the administrative law judge in order to clarify apparently conflicting positions taken by the Secretary of Labor with respect to whether she intended to regulate facilities such as Penelec pursuant to MSHA or OSHA.[5] In a three to one decision, the Commission wrote:

> [W]e conclude that MSHA possesses statutory authorization to regulate working conditions associated with Penelec's preparation of coal, and that the Secretary of Labor could decide to make mine safety standards applicable to the disputed area. Whether she has done so, however, is another matter and one which we are unable to determine with any degree of assurance from the murky record presently before us.

*Secretary of Labor v. Pennsylvania Electric Co.*, 11 F.M.S.H.R.C. 1885 (Oct. 10, 1988).

On remand, the Secretary of Labor objected to the scope of the remand order and maintained that "Commission review of her internal decision-making processes and intrusion by the Commission into her reasons and motives for such decisions [were] impermissible and privileged." *Secretary of Labor v. Pennsylvania Electric Co.*, 12 F.M.S.H.R.C. 123, 124 (Jan. 23, 1990). The administrative law judge found it unnecessary to reach the issues raised by the Secretary:

> Following additional hearings on remand I find that although the Secretary never clearly established, prior to the issuance of the citations at bar, that MSHA would assert exclusive inspection authority over the subject 5A and 5B head drives, I do not find in these civil proceedings any legally cognizable Secretarial impropriety in exercising her authority to regulate the area of the cited 5A and 5B head drives identified or sanctioned within the framework of the Act.

*Id.* (footnote omitted).

On review of the administrative law judge's decision following remand, the Commission members divided evenly over whether the decision of the administrative law judge should be affirmed. Two Commissioners voted to affirm. One voted to reverse on the ground that Mine Act jurisdiction was not broad enough to encompass the conveyor head drives at the Homer City station, and the final Commissioner voted to reverse on the ground that the Secretary, while authorized to regulate via MSHA, had not exercised her statutory authority to regulate under that Act. The

---

**4.** I believe that the procedural history of this matter is important. It fleshes out the difficulties inherent in this case and, most importantly, demonstrates that the Federal Mine Safety and Health Review Commission wrestled with the very issues which we consider here and makes clear that those issues were not and are not as easily resolved as the majority opinion suggests.

Because this procedural history is not set forth in the majority opinion, I include it here.

**5.** The parameters of these conflicting positions are most relevant to the issues discussed in Section III of this dissent and are outlined there in more detail.

Commission concluded that the effect of the split was to affirm the decision of the administrative law judge that the citations issued through MSHA were appropriate and enforceable. This appeal followed.

As the majority points out, disposition of this appeal requires that we address two issues: 1) does MSHA possess the statutory authority to regulate the 5A and 5B conveyor head drives at the Homer City Station; and 2) assuming such statutory authority, had the Secretary exercised authority under MSHA prior to the issuance of these citations. I differ with the majority with respect to both of these issues and will address each in turn.

## II.

Whether the Secretary possesses the requisite statutory authority under the Mine Safety and Health Administration to regulate the 5A and 5B conveyor head drives turns upon whether these head drives are involved in "the work of preparing the coal" within the meaning of section 802(i) of the Mine Act. Our review of this question of statutory interpretation is plenary. *Government Employees Insurance Co. v. Benton,* 859 F.2d 1147, 1149 (3d Cir.1988).

The parties join issue over whether the head drives of conveyors 5A and 5B are used in "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine." 30 U.S.C. § 802(i). In order to be involved in "the work of preparing the coal," it is undisputed that the facility or equipment at issue must meet two criteria: 1) the equipment must be used in connection with one or more of the processes enumerated (i.e. breaking, crushing, etc.); and 2) the preparation at issue must be of a type usually performed by a coal mine operator. *See, e.g., Secretary of Labor v. Pennsylvania Electric Company,* 11 F.M.S.H.R.C. 1875, 1880 (Oct. 10, 1989) (performance of listed work activities and nature of the operation performing those activities are relevant in determining whether coal preparation is

taking place); and *Secretary of Labor v. Oliver M. Elam, Jr., Co.,* 4 F.M.S.H.R.C. 5, 7 (Jan. 7, 1982) (inherent in the determination of whether an operation properly can be classified as "mining" is the nature of the operation performing such activities).

The focus of the inquiry in this matter is upon the second of the section 802(i) criteria: Is the activity in which the conveyer heads are used part of the "work of preparing [the] coal as is usually done by the operator of the coal mine?"

It is undisputed that Penelec is not an operator of a coal mine in the sense in which that term is commonly understood. The majority, nonetheless, summarily states that Mine Act jurisdiction attaches here because the conveyor-head drives are "structures used in the work of preparing coal." Then, in purporting to apply a "functional analysis" to the conveying activity, the majority reaches the conclusion that "the delivery of coal from a mine to a processing station via a conveyor constitutes coal preparation 'usually done by the operator of a coal mine.'" Majority Op. at 1503. This result, reasons the majority, is supported by our holdings in *Hanna v. Director, OWCP,* 860 F.2d 88, 92–93 (3d Cir.1988), and *Stroh v. Director, OWCP,* 810 F.2d 61 (3d Cir.1987), two cases decided under the Black Lung Benefits Act, 30 U.S.C. §§ 901–945, a subchapter of the Mine Act.

I have grave concerns with this abbreviated analysis. While it is superficially appealing, in reality it represents a dramatic departure from settled Mine Act interpretation and extends the jurisdictional reach of MSHA far beyond any outer limit ever established. Under the majority's analysis, *every* end-user of coal—including electric utilities, steel mills, aluminum mills, and chemical plants which have *never* been subject to regulation under MSHA,—that engages in *any* of the activities enumerated in section 802(i) of the Mine Act, i.e., breaking, storing, mixing, etc., would fall within the section 802(h)(1) definition of a coal mine since each of those activities can be placed under the penumbra of "work of preparing coal." Taken to its logical end,

the majority's argument would require that at least that portion of any business operation in which coal is utilized could be appropriately characterized as work of preparing coal.

While the majority correctly identified our precedent as recognizing that the definition of a mine for purposes of Mine Act coverage is to be given a broad interpretation, *Marshall v. Stoudt's Ferry Preparation Co.*, 602 F.2d 589, 592 (3d Cir.1979), that broad interpretation, until now, has had limits. *See MSHA v. Oliver M. Elam, Jr.*, 4 F.M.H.S.R.C. at 7 ("simply because [an operator] in some manner handles coal does not mean that it is a 'mine' subject to the Act"); *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1551 (D.C.Cir.1984), also makes clear that MSHA jurisdiction has defined boundaries,

> It is clear that every company whose business brings it into contact with minerals is not to be classified as a mine within the meaning of section 3(h). The jurisdictional line drawn by the statute rests upon the distinction, which is somewhat elusive, to say the least, between milling and preparation, on the one hand, and manufacturing, on the other. Classification as the former carries with it Mine Act coverage; classification as the latter results in Occupational Safety and Health Act regulation.

*Id.* at 1551.

Though the legislative history of the Mine Act states that the definition of a mine is to be given the broadest possible interpretation, S.Rep. No. 95–181, 95th Cong., 1st Sess. 14 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 3401,

3414, "it cannot be forgotten that the Act was intended to establish a 'single mine safety and health law, applicable to all *mining* activity.' S.Rep. No. 461, 95th Cong., 1st Sess. 37 (1977) ... 'There is no indication of any intention to follow the coal wherever it might go and certainly no indication that Congress intended to regulate other industries such as electric utilities or steel mills....'" *Secretary of Labor v. Pennsylvania Electric Co.*, 11 F.M.S.H.R.C. at 1889–1890 (Doyle, Com., dissenting). The fact that the Mine Act has consistently been interpreted as less than all-encompassing and that Congress has, for years, acquiesced in this interpretation indicate that "MSHA [and the majority have] embarked here upon a course at odds with consistent prior policy...." *Id.* at 1885.

In order to illustrate the nature of the change effected by the majority, it is helpful to examine the jurisdictional line drawing that has been established in caselaw interpreting the Black Lung Benefits Act.[6] The Benefits Act was intended to provide disability payments to miners unable to work as a result of black lung disease contracted in connection with employment in a "coal mine." The identical section 3(h) definition of "coal mine" at issue in this case applies to determinations to be made under the Benefits Act. *Consolidation Coal Co. v. McGrath*, 866 F.2d 1004, 1005 (8th Cir.1989).

Contrary to the impression conveyed by the majority, the caselaw interpreting section 802(i) in the context of the Benefits Act uniformly holds that the phrase "prep-

---

6. Not having found cases to support the proposition that the term "coal mine" is to be interpreted differently in determining Mine Act coverage than in determining Benefits Act coverage, I, like Commissioner Doyle,

> view the test developed [in the Black Lung context] as quite relevant in determining when an operation falls within the definition of a "coal mine." In fact, ... [we], in deciding a black lung case, made specific reference to [our] earlier holding in [*Stoudt's Ferry*], a *Mine Act case*, as authority for [our] construction of the terms "coal mine" and the "work

of preparing the coal." *Dowd v. Director, OWCP*, 846 F.2d 193, 195 (3d Cir.1988). *Secretary of Labor v. Pennsylvania Electric Co.*, 11 F.S.H.R.C. at 1184 (emphasis in original).

This definitional unity between Mine Act and Benefits Act cases suggests another serious consequence of the approach taken by the majority. The majority's determination could require that all Penelec employees and, consequently, other coal consumer employees affected by this decision be considered "miners" entitled to black lung benefits. The decision announced today might require substantial revision of established Benefits Act precedent.

aration of the coal" has *no* application to processing not undertaken for a commercial purpose. In *Wisor v. Director, OWCP,* 748 F.2d 176, 179 (3d Cir.1980), we held, in a Benefits Act case, that the section 802(h)(1) definition of a coal mine "includes a commercial purpose requirement. If an employee delivers coal to the employer which the employer purchases and processes for its own consumption, that employee would not be engaged in the 'work of preparing' the coal as defined in the Act." Although not so interpreted by the majority, this is consistent with our holdings in *Stroh v. Director, OWCP,* 810 F.2d 61, 64 (3d Cir.1987), that if an employee delivers coal to the employer which processes the coal for its own consumption, that employee is not engaged in the "work of preparing the coal" within the meaning of the Act, and in *Dowd v. Director, OWCP,* 846 F.2d 193, 195 (3d Cir.1988), where we found that an employee working in a coal preparation facility was a "miner" within the terms of the statute but stressed "that Dowd's employer does not handle processed coal, does not consume the coal, and does not utilize the coal to produce a product or products other than coal" (footnotes omitted).

Our decision in *Hanna v. Director, OWCP,* 860 F.2d 88 (3d Cir.1988), is not to the contrary. In *Hanna,* the claimant was employed loading coal from a processing tipple of a mine onto barges that delivered coal to steel mills. A single entity owned

the mines, the mills, and everything in between. Even though the mine operator and the ultimate consumer were one, we did not abandon the stream of commerce analysis adopted in *Stroh* and *Dowd.* We concluded instead that the claimant's work "constituted participation in coal preparation and that ... it was not until the coal was loaded onto barges and ready to flow down the Monongahela on its way to [the mill] that it—both literally and figuratively—entered into the stream of commerce." *Id.* at 93. We did not suggest that employees engaged in breaking, storing, or otherwise processing the coal at the mill itself would have been accorded the status of miners for purposes of the Benefits Act. Even where the mine and mill owners were identical, the definition of a "coal mine" was not held broad enough to encompass the entire operation. Preparation was deemed to have ended at the point where the coal would have entered the stream of commerce had multiple entities been involved.[7]

Clearly these Benefits Acts cases, while assuming a practical approach to what constitutes "the work of preparing coal," do not establish a basis for the jurisdictional expansion endorsed by the majority. The majority's position abandons any version of the ultimate consumer or stream of commerce test and does not offer a workable predictable means for determining, in fu-

---

7. For similar statements construing section 802(h)(1) of the Mine Act, *see Director, OWCP v. Consolidation Coal Co.,* 923 F.2d 38, 41–41 (4th Cir.1991) (coal considered to be beyond the preparation stage once it has been processed and prepared for market; crushing of coal after it has entered the stream of commerce does not fall within the coverage of the statute); *Amax Coal Co. v. Fagg,* 865 F.2d 916, 918–19 (7th Cir.1989) (work of preparing the coal "occurs precedent to retail distribution and consumption"); *Director, OWCP v. Ziegler Coal Co.,* 853 F.2d 529, 536 (7th Cir.1988) (preparation of coal involves what is done to the coal after it is extracted from its natural deposit and prior to its retail distribution and consumption); *Eplion v. Director, OWCP,* 794 F.2d 935, 937 (4th Cir. 1986) (employee transporting previously processed coal to barges for delivery to customers not involved in "the work of preparing the coal" even though the customer washed the

coal); *Foreman v. Director, OWCP,* 794 F.2d 569, 571 (11th Cir.1986) (although further processing such as wetting coal dust was performed by power plant to satisfy its own requirements, this work did not fall within the parameters of the Act); *Johnson v. Weinberger,* 389 F.Supp. 1296, 1298 (S.D.W.Va.1974) (employee who shoveled coal into a crusher, crushed coal and sent it over conveyor into chemical mill was not "miner"; "preparation of coal" relates to preparation prior to shipment and use of coal in commercial facilities); *Young v. Weinberger,* 389 F.Supp. 979, 980 (S.D.W.Va.1975) ("work of preparing the coal" did not extend to worker at metal processing plant where coal was used in operation of the plant); *Ferris v. Director,* OWCP, 3 Black Lung Reptr. 1–320 (1981, BRB) (where power plan purchased partially processed coal and pulverized it for its own use, employer was a consumer of coal rather than a coal producer and was not a "coal mine").

ture cases, where preparation ends and the process of manufacturing begins.[8]

I do not believe that this abandonment of jurisdictional confines is mandated by the facts of this case or by the language of the statute. Penelec purchases coal which has *already undergone processing* and is "in condition for delivery to distributors and consumers." *Roberts v. Weinberger,* 527 F.2d 600, 602 (4th Cir.1975). Merely because *some* of the coal travels over the 5A and 5B conveyers before treatment in a Penelec facility to bring the coal into compliance with a specific environmental standard does not, in my view, render that coal preparation which is usually performed by the "operator of the coal mine." As I have noted, to so hold would require that all consumers of coal performing any preparation activity whatever be brought within Mine Act jurisdiction and would have potentially serious consequences, not addressed by the majority, for the employees of these consumers. The majority fails to make clear that, at the Penelec facility, MSHA proposes to regulate only those conveyors leading to the coal cleaning facilities. Identical conveyors on the other side

**8.** Also, the majority has not cited a Mine Act case holding that MSHA jurisdiction might extend to the situation covered here. This is clearly not the type of operation discussed in *Marshall v. Stoudt's Ferry,* 602 F.2d at 592, where we decided that the term "mine" as used in the Act was broad enough to encompass a preparation plant which separated a low-grade fuel from sand and gravel which had been dredged from a river bed. Our holding relied upon a finding that the activity at the Stoudt's Ferry mineral preparation facility was akin to traditional mining operations. To apply *Stoudt's Ferry* here, it would be necessary to equate Penelec's operation as a "custom coal preparation facility."

While my research does not reveal a definition of "custom coal preparation" in the statute or its legislative history, references in the caselaw and to closely related concepts in mining publications suggest that the term was intended to apply to those operations which process coal for retail distribution. *See, e.g., Dowd v. Director, OWCP,* 846 F.2d 193 (3d Cir.1988) (coal preparation facility purchased unprocessed coal which it dried, ground, bagged and sold to manufacturers; coal was prepared to specification of customers); *Stroh v. Director, OWCP,* 810 F.2d 61 (custom coal preparation facility was not ultimate consumer; facility prepared coal for resale); *Harman Min. Corp. v. Federal Mine*

of the cleaning facility would continue to be subject to regulation by OSHA. As the amicus brief of Edison Electric Institute, an association of investor-owned electric companies generating 78 percent of all the electricity in this country, points out:

> Nothing in the record suggests that the hazards inherent in operating and maintaining [the conveyor system which carries coal from the cleaning plant] are any different than those attendant to the conveyor feeding coal to the cleaning plant. But the approach which this Court is asked to affirm, when coupled with the existing inconsistencies among important OSHA and MSHA standards, would dictate significant differences in equipment design, as well as in employee safety work rules and training. As ... the Fourth Circuit recognized in *Old Dominion Power Co. v. Donovan,* 772 F.2d 92, 99 (4th Cir.1985), "[r]equiring electric utility employees suddenly to adhere to conflicting standards depending on their job location can only lead to danger, especially where work around high voltage is involved." [9]

*Safety and Health Review Commission,* 671 F.2d 794, 796 (4th Cir.1981) (coal preparation facility prepared coal for market); *Secretary of Labor v. Mineral Coal Sales, Inc.,* 7 F.M.S.H.R.C. 615 (May 16, 1985) (coal handled at preparation facility purchased by coal brokers). *See also* the definition of "custom mill" set forth in *A Dictionary of Mining Mineral & Related Terms,* U.S. Department of the Interior, 1968 (1990 reprint) which reads as follows:

1. mill that buys ores for treatment or which treats ores for customers;
2. plant receiving ore for treatment from more than one mine.

These authorities are consistent with those cases decided under the Benefits Act in that they do not suggest that ultimate consumers processing coal incident to their own consumption constitute "custom coal preparation facilities for purposes of the Mine Act." I do not believe that the term "custom coal preparation facility" can have any application once the coal "is in condition for delivery to distributors and consumers." *Weinberger,* 527 F.2d at 602.

**9.** There are *significant* differences between MSHA and OSHA regulations respecting electric utilities that have led at least one court to conclude that "MSHA's standards are not applicable to electric utilities and could not have been adopted with electric utilities in mind." *Old*

Nothing in the facts of this case or in the majority opinion convinces me that the majority's departure from prior interpretation of the Mine Act is supportable under the caselaw or under the terms of the Act itself. Accordingly, I would hold that the conveyor heads at issue do not fall within the coverage of the Mine Act.[10]

### III.

Having set forth the grounds upon which I base my difference with the majority with respect to the jurisdictional reach of the Mine Act, I turn next to the question of whether, assuming arguendo that the majority is correct that the conveyor heads at issue fall within the terms of the Mine Act, the Secretary of Labor has exercised regulatory authority under MSHA sufficient to preempt OSHA jurisdiction.

Section 4(b)(1) of the Occupational Safety and Health Act, 29 U.S.C. § 653(b)(1) (1985) provides that:

Nothing in this Chapter shall apply to working conditions of employees with respect to which other federal agencies ... exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health.

As we stated in *Columbia Gas of Pennsylvania, Inc. v. Marshall*, 636 F.2d 913, 915–16 (3d Cir.1980),

[S]ection 4(b)(1) preemption requires a two-part showing; first, that a coordinate federal agency has "exercised" authority by promulgating regulations in the area and second, that these concurrent regulations cover the specific "working conditions" purportedly within OSHA's jurisdiction.

*Dominion Power Co. v. Donovan*, 772 F.2d at 98. For some of the most significant differences in MSHA and OSHA regulations, see *Old Dominion*, 772 F.2d at 98–99.

10. In reaching this conclusion, I am mindful that, as a general rule, courts are bound to defer to an agency's reasonable construction of the statute for which it bears administrative responsibility. *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It is true, however, that with respect to questions of statutory construction, "[t]he judiciary is the final authority ... and must reject administrative

The majority rejects Penelec's assertion that the Secretary of Labor has failed to exercise authority under MSHA sufficient to preempt OSHA regulations of the 5A and 5B conveyor head drives. Instead, I believe that proper resolution of this matter requires that we examine the Secretary's approach to regulation of Penelec and other power-producing facilities. In my view, the regulatory history fails to demonstrate the Secretary's consistent and unequivocal exercise of authority under MSHA.

In *Columbia Gas*, we stated unequivocally that, in order for OSHA to be deprived of jurisdiction, "mere declaration of authority over the area is not enough." *Id.* at 916 n. 7.

Contrary to the suggestion of the majority, examination of the enforcement history of a regulation does not effect a broadening of the *Columbia Gas* two-step inquiry. Rather, such a query is essential to determine if the first prong, the exercise of authority test, has been met. In *Southern Railway Company v. OSHRC*, 539 F.2d 335 (4th Cir.) *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976), the import of an agency's actual exercise of authority was discussed:

While Section 4(b)(1) may not be entirely self-defining, it is clear that the exemption applies only when another Federal agency has actually exercised its statutory authority. It does not apply where such an agency has regulatory authority but has failed to exercise it. This is clear not only from the statutory language but from the legislative history

constructions which are contrary to clear congressional intent." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9. For the reasons detailed above, I am convinced that the Secretary has exceeded the clear intent of the Mine Act in seeking to assert jurisdiction over the 5A and 5B conveyor head drives. Her construction of the Act to apply virtually without limitation is contrary to precedent and, as will be discussed in the next section of this dissent, has been far from consistent, signaling a dramatic change in policy with no prior notice to those affected. In these circumstances, I believe that deference which might ordinarily be accorded to the Secretary's interpretation of the Mine Act is not appropriate.

as well. Earlier versions of the legislation had provided that the mere existence of statutory authority in another Federal agency was sufficient to invoke the exemption, but they were rejected by the Congress. See Legislative History of the Occupational Safety and Health Act of 1970, pp. 62, 620, 671, 710 (Committee Print, 1971) (Legislative History). That actual exercise of the statutory authority rather than its mere existence was contemplated is clearly evident from the following colloquy during debate on the Act in the House of Representatives:

"MR. ERLENBORN. If there is authority under the Federal law, but is has [not] yet been put into effect and it is not being exercised by the executive agency because they have no rules or regulations, then until they do adopt rules and regulations and exercise that authority—then this does apply; is that correct?
MR. DANIELS of New Jersey. Yes, that would be correct. The gentlemen has placed his finger on the key word—and the key word is 'exercise'.

If an agency fails to pursue the law and exercise the authority that has been given to it, then this law will step in.
MR. ERLENBORN. In other words, the mere existence of statutory authority does not exempt an industry? It is the exercise of that authority pursuant to the statute that does exempt it; is that correct?
MR. DANIELS of New Jersey. That is correct." Legislative History, p. 1019.

*Id.* at 336–37.

Here the focus of the *Columbia Gas* inquiry is on 30 C.F.R. § 77.400(c), an MSHA regulation incorporated in 30 C.F.R. Part 77, "Mandatory Safety Standards, Surface Coal Mines and Surface Work Areas of Underground Coal Mines." This regulation provides that:

guards at conveyor-drive, conveyor head, and conveyor-tail pulleys shall extend a distance sufficient to prevent a person from reaching behind the guard and becoming caught between the belt and the pulley.

The scope of Part 77, within which this regulation is contained, is set forth in 30 C.F.R. § 77.1:

This part 77 sets forth mandatory safety standards for bituminous, anthracite and lignite surface coal mines, including open pit and auger mines, and to the surface work areas of underground coal mines.

The Secretary and Penelec disagree with respect to whether this regulation satisfies the *Columbia Gas* requirement that regulation be directed to specific "working conditions." I will not dwell upon this issue here as my concern with the Secretary's exercise of statutory authority, assuming that such statutory authority exists, is not so much with whether there was an applicable MSHA standard in existence at the time that the citation to Penelec was issued, but with whether, in the totality of the circumstances then existing, Penelec could reasonably have known that it was subject to regulation under that standard. In my view, "[i]t has not been demonstrated that the agencies involved, let alone Penelec, had a clear understanding of the jurisdictional lines of demarcation at the time the citations were issued." *Secretary of Labor v. Pennsylvania Electric Co.,* 12 F.M.S.H.R.C. at 1569 (Ford, Chairman, dissenting).

The following chronology, which parallels in most respects the chronology set forth by Chairman Ford in the Commission proceedings, illustrates my concerns with the majority's conclusion that the January 7, 1988, citation to Penelec should be upheld on the strength of the jurisdictional assertion set forth in the citation itself. During the period extending from July 5, 1977, through December 13, 1989, the following events transpired:

1. *July 5, 1977*—Following construction of the Penelec treatment plant, MSHA district manager Huntley wrote to Mason, an OSHA operation officer, challenging OSHA's jurisdiction over the cleaning plant based on the conclusion of the Deputy Associate Solicitor for Mine Health and Safety that the plant fell within MSHA jurisdiction.

2. *July 28, 1977*—Coal Mine Inspection Supervisor Robert Nelson prepared a memorandum delineating locations at the generating station where Iselin Preparation Company "has or will have control." No specific reference was made to the 5A and 5B conveyors, although the "blending bin" was considered to be part of Iselin. This blending bin, also referred to as Bin No. 2, contains the 5A and 5B head drives.

3. *August 25, 1977*—Penelec and MESA representatives met and reached an oral agreement as to areas covered by OSHA and MESA jurisdiction.

4. *September 6, 1977*—Penelec representative Herman, a participant in the August 25 meeting with MESA, prepared a memorandum memorializing his understanding of the agreement which had been reached. "At #2 Bin MESA will have jurisdiction above the top of the bin *except for the portions of #5A and #5B conveyors within the structure* including the drive units and head pulleys."

5. *April 17, 1979*—An MSHA/OSHA Interagency Agreement was drawn up to apprise facilities of the limits of MSHA jurisdiction. The examples given of facilities included with MSHA jurisdiction were closely related to traditional mining activities with jurisdiction ending when the product leaves mine property. The issue of jurisdiction over coal handling at electric power plants was not addressed.

6. *Sometime in 1989*—MSHA safety inspector Kopsic testified that beginning in about 1980 he began inspecting the 5A and 5B conveyors and issued citations, including one for inadequate guarding, to Rochester and Pittsburgh Coal Co., the owner of the cleaning plant. He contended that Penelec management must have known of these citations and the consequent assertion of jurisdiction because Penelec employees abated the violations.[11]

Penelec challenges the allegation that the 5A and 5B conveyors were cited (no citations were produced) and denies any knowledge that MSHA jurisdiction was different from what had been memorialized in the September 6, 1977, memorandum. Penelec also denied that it had been issued citations by MSHA covering cleaning plants at other facilities. MSHA conceded that Penelec had not been cited at other plants but stated that the citations had been issued to cleaning plant owners.

7. *November 29, 1985*—In a Motion to Dismiss filed with the Commission in *Utility Fuels, Inc.*, Docket No. CENT 85–89, Counsel for the Secretary represented that:

MSHA traditionally has not inspected power plants. Although the Secretary is not able to cite to a particular memorandum incorporating this policy, MSHA and its predecessors have consistently found the production of power to be outside the jurisdiction of the agency. MSHA has taken into account that a portion of the process utilized to produce electric power from coal requires handling and processing coal but has determined that those activities are subsumed in the specialized process utilized to produce electric power, and that the power plant process is more feasibly regulated by OSHA.

8. *January 7, 1988*—The citations in question are issued to Penelec.

9. *February 25, 1988*—Orris, manager of safety for Penelec, writes to MSHA district manager Huntley seeking clarification of jurisdiction.

10. *April 12, 1988*—Huntley responds by stating that the 1977 Mine Act "extends to all areas which contribute to or play a part in the work of preparing coal." The letter included a list of facilities that MSHA *"is currently not inspecting but which MSHA has jurisdiction over and will be inspecting."* Conveyors 5A and 5B were included in this list.

11. *April 14, 1988*—Huntley sends to the OSHA area director a copy of the April 12th letter to Penelec. There was no response from OSHA challenging MSHA jurisdiction. OSHA staff person Terry Lane testified that the OSHA Philadelphia regional office received a copy of the April 12th letter and "[felt] that the areas out-

---

**11.** I question whether abatement by Penelec employees in these circumstances is sufficient to impute knowledge of MSHA regulation to Penelec management.

lined in that correspondence [were] clearly within the jurisdiction of MSHA."

12. *December 30, 1988*—The ALJ's initial decision finds MSHA jurisdiction over 5A and 5B head drives.

13. *January 28, 1989*—At oral argument in a companion case to this one, *Westwood Energy Properties v. Secretary of Labor, MSHA*, 11 F.M.S.R.C. 2408 (December, 1989), counsel for the Secretary states that coal consumers such as steel mills and aluminum plants may be subject to Mine Act jurisdiction if they engage in coal processing activities. Even though Westwood *did* engage in such activities, MSHA settled that case and declined to assert jurisdiction.

14. *January 31, 1989*—OSHA issues proposed Rule 29 C.F.R. Part 1910 relating to Electric Power Generation, Transmission, and Distribution; Electrical Protective Equipment. In the proposed rule, OSHA stated that the rule was intended to cover work practices at "[f]uel and ash handling and processing installations such as coal conveyors and crushers." 54 Fed. Reg. 4973–5024 (January 31, 1989).

15. *October 10, 1989*—The Commission issues its decision in this matter and remands.

16. *December 13, 1989*—The ALJ issues an opinion following remand which notes that the Secretary objected to the scope of the remand order and maintained that Commission review of her internal decision-making processes amounted to an intrusion into privileged areas. The ALJ did not think it necessary to reach this issue.

I believe that notwithstanding the MSHA regulation relied upon in the citation issued to Penelec, the above record of events demonstrates that:

---

**12.** Note the conflicting positions taken by the MSHA inspector and Penelec which is detailed in step 5 of the chronology set forth, *supra*. I recognize that we

> must accept the ALJ's findings of fact if they are supported by substantial evidence in the record considered as a whole. Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as sufficient to support a conclusion.

There existed on January 7, 1988 no official Department of Labor policy that assigned coal handling and processing activities undertaken by an electric utility to MSHA's jurisdiction. On the contrary, the last official pronouncement of record prior to January 7, 1988 that addressed such activities was the Secretary's declaration in *Utility Fuels* ... that coal handling and processing at power plants was "more feasibly regulated by OSHA."

*Secretary of Labor v. Pennsylvania Electric Co.*, 12 F.M.S.H.R.C. at 1572 (Ford, Chairman, dissenting) (citation omitted).

Under these circumstances, I cannot agree that "the Secretary of Labor sufficiently exercised her authority by issuing citations under the existing MSHA regulations...." Majority Op. at 1505. Penelec was given conflicting signals concerning its obligations under the Mine Act prior to issuance of the January 7, 1988, citation. The evidence simply does not demonstrate that Penelec knew in January of 1988, that the 5A and 5B conveyor head drives were subject to MSHA citation.[12] In my view, the regulatory confusion highlighted by this case has *yet* to be resolved. There seems still to be a conflict among the Secretary's position in this case, her position in *Westwood* and her position with respect to the proposed OSHA regulations. Despite repeated efforts throughout these proceedings to clarify the Secretary's regulatory intent,

> the record still exhibits inconsistencies in enforcement policies and practices ...; unanswered questions as to whether there is an overall Departmental plan for accommodating jurisdictional tensions between the Mine Act and the [OSH Act] at coal-fired power plants; and a patchwork scheme of inspections that does not adequately address the ... "whipsaw ef-

---

*Director, OWCP v. Consolidation Coal Co.*, 884 F.2d 926, 929 (6th Cir.1989). In this case, however, the ALJ himself concluded that "[T]he Secretary never clearly established, prior to the issuance of the citations at bar, that MSHA would assert exclusive inspection authority over the subject 5A and 5B head drives...." *Secretary of Labor v. pennsylvania Electric Co.*, 12 F.M.S.H.R.C. 123 at 124 (Jan. 23, 1990).

fects to which an employer can be subjected when important jurisdictional issues appear to be resolved with no assurance that potentially competing agencies have reached a mutual and definitional determination as to their respective roles."

*Secretary of Labor v. Pennsylvania Electric Co.,* 12 F.M.S.H.R.C. at 1569 (Ford, Chairman, dissenting) (citation omitted). Assuming that the Secretary does have statutory authority to regulate MSHA, what is needed is a clear statement by the Secretary regarding jurisdictional limits, which should be enforced *prospectively.* An employer should not be required to guess what the Secretary's regulatory position will be on any given day.

### IV.

Because I am convinced that it makes most sense to view Penelec's coal conveying operation as part of the process of electric power generation rather than as work of preparing coal, I would find that MSHA lacks jurisdiction to regulate the 5A and 5B conveyor head drives. Alternatively, in view of the Secretary's unclear policy of allocating regulatory responsibility between MSHA and OSHA, I would conclude that even if the Secretary has statutory authority to regulate the head drives via MSHA, she has failed adequately to exercise that jurisdiction. On either ground, I would reverse the Commission's decision.